278 A.2d 852.

ADVISORY OPINION TO THE SENATE OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS.

JUNE 25, 1971.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

ADVISORY OPINION, requested by the Senate and having reference to the composition of a petit jury.

June 25, 1971

To the Honorable, the Senate of the
    State of Rhode Island and
        Providence Plantations

In accordance with the provisions of section 2 of article XII of amendments to the constitution of this state the undersigned Justices of the Supreme Court respectfully submit their answer to the question embodied in a resolution adopted by the Senate on February 10, 1971, and thereafter transmitted to us. While the resolution states that our reply should be transmitted to Your Honors on the first day of the General Assembly's 1972 session, we regard that date as being the final day on which we can file our reply. We have completed our analysis and study of the issue presented to us. It involves a matter of sub-

stantial public interest. Since you are still in session, we have taken the liberty of forwarding you our response at this time so that you will have the opportunity, before terminating your current legislative efforts, to take such action as you think necessary after your consideration of the opinions expressed herein.

The resolution recites the pendency before the Senate of an act enumerated as Senate #187, a copy of which accompanied the resolution. An examination of the pending legislation shows it proposes a reduction in the size of the petit jury from its present membership of twelve to six. The question of law asked of us is:

"Are the provisions of Senate #187, introduced in the 1971 general assembly session being an act in amendment of Section 9-10-12 in chapter 9-10 of the General Laws entitled 'An act reducing the size of juries to "6" a violation of any provisions of the constitution of the United States or the Constitution of the State of Rhode Island?' "

Initially, we would point out that our reply to your inquiry is not to be construed as any departure from the well-established rule that, in posing a question such as the one presently before us, the body seeking our opinion should direct our attention to the specific provision of the constitution or statute which might be violated by the enactment of pending legislation. *See, Opinion to the House of Representatives*, 99 R. I. 377, 208 A.2d 126. It is obvious to us that Senate #187 was prompted by the recent case of *Williams* v. *Florida*, 399 U. S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, where the United States Supreme Court ruled that a Florida statute which allowed the use of a six-man jury in a criminal case did not violate the Federal Constitution's sixth-amendment guarantee of right to a jury trial. It is quite apparent to us that the constitutional provisions referred to in your inquiry are the sixth and seventh amendments to the United States Constitution

and sections 10 and 15 of article I of the Rhode Island constitution. While we see no federal constitutional objection to the use of a six-man jury in trials held before the courts of this state, we do believe that the pending legislation conflicts with the Rhode Island constitution.

There is no need to dwell at any length on the federal constitutional aspects of your inquiry. The sixth amendment states that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime was committed. In 1968, the United States Supreme Court ruled that the fourteenth amendment incorporates the sixth-amendment right to a jury trial and makes it applicable to the states. *Duncan* v. *Louisiana,* 391 U. S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491. Later in *Williams,* the Supreme Court ruled that not every common-law jury feature was made a part of the constitution. It alluded to the fact that the original version of the sixth amendment,[1] as introduced in the House of Representatives by James Madison, called for a jury having many of the features of a common-law jury. The proposed amendment was referred to a conference committee composed of members of the House and Senate. When it was reported out of committee, several of the aforementioned common-law features had been deleted. The Court remarked that if the First Congress really wished to incorporate the twelve-

---

[1]The amendment, as first proposed, provided in part "The trial of all crimes * * * shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge and other accustomed requisites." 1 Annals of Cong. 435 (1789). When this amendment finally emerged from committee, all reference to unanimity and other accustomed requisites had been dropped and the "vicinage" requirement had been revised. Vicinage, technically speaking, means the neighborhood. In some states, however, juries were selected from the state at large and a compromise was reached by the use in the sixth amendment of the term "district." Vicinage has been construed to mean "county." *Taylor* v. *Gardiner,* 11 R. I. 182 (1875).

man feature of a common-law jury into the sixth amendment, it would have used the precise language it employed in the Judiciary Bill when it expressly spoke of the "vicinage." The Judiciary Bill was signed by the President on the same day that Congress agreed to the final form of the sixth amendment. It also emphasized that when the seventh amendment was drawn up, explicit reference was made to "the rules of the common law." 399 U. S. at 97, 90 S.Ct. at 1904, 26 L.Ed.2d at 458.

The Court in *Williams* acknowledged that in *Thompson* v. *Utah,* 170 U. S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898), it was decided that the jury referred to in the sixth amendment was a jury "constituted, as it was at common law, of twelve persons, neither more nor less." However, Mr. Justice White, in speaking for the majority in *Williams,* observed that the *Thompson* pronouncement was based in part on its reliance on the Magna Carta. He then went on to point out that there had been a faulty translation of the Latin used in that document which, in the opinion of many legal scholars, does not justify any reference to the Great Charter as authority for fixing the number of a jury at twelve. The Court also faulted the reasoning in *Thompson* for its lack of discussion as to why every feature of a common-law jury was included in the Federal Constitution wherever it spoke of a "jury."

The seventh amendment provides for a jury trial in any civil actions that were triable before a jury at the time the amendment was adopted. *United States* v. *Louisiana,* 339 U. S. 699, 70 S.Ct. 914, 94 L.Ed. 1216; *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 57 S.Ct. 615, 81 L.Ed. 893. This amendment has not been made applicable to trials in state courts. *Pearson* v. *Yewdall,* 95 U. S. 294, 24 L.Ed. 436; *Harada* v. *Burns,* 50 Hawaii 528, 445 P.2d 376; *State* v. *Beer,* 252 La. 756, 214 So.2d 133; *see,* also, *In Re the Condemnation of Certain*

*Land for a new State House,* 19 R. I. 326, 33 A. 448. Accordingly, the seventh amendment[2] does not bar the use of a jury of six in the Rhode Island judicial system.

Although we are bound by the Court's interpretation of the meaning and extent of the jury-trial provision of the sixth amendment, we are free to interpret the jury-trial provision found in the Rhode Island constitution. We are of the opinion that the petit jury referred to in our state's constitution means a panel of twelve, not because of the Magna Carta or what transpired when Congress deliberated in 1789, but because our constitution was made by Rhode Islanders for a Rhode Island government and the word "jury" must be accorded the significance that it had in 1842, particularly in the light of the provisions of the Rhode Island constitution relating to a trial by jury.

The pertinent provisions of our state's constitution are contained in article I, sections 10 and 15. They provide:

"Sec. 10. In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *."

"Sec. 15. The right of trial by jury shall remain inviolate."

In speaking of the jury trial described in our constitution our court has said that trial by jury is a "well known kind of trial." *Mathews* v. *Tripp,* 12 R. I. 256 (1879). The inviolability provision of section 15 has been held to be a guarantee that a petit jury will continue to be constituted substantially as a jury was constituted when the constitution was adopted and that cases then triable by jury will continue to be so triable without any restrictions or conditions which could materially hamper or burden the right. It demands that the right to a trial by jury be

[2]The Court in the *Williams* case took pains to point out in footnote 30 of Mr. Justice White's majority opinion that it was not deciding whether a statute calling for something other than a twelve-man jury would violate the seventh amendment.

conserved. *Briggs Drive, Inc.* v. *Moorehead,* 103 R. I. 555, 239 A.2d 186; *Gunn* v. *Union R.R.,* 23 R. I. 289, 49 A. 999; *Crandall* v. *James,* 6 R. I. 144 (1859).

While the General Assembly may impose reasonable conditions on the exercise of the right to a trial by jury, the inviolate clause of our constitution prohibits any legislative attempt to abolish or alter this right. *Dyer* v. *Keefe,* 97 R. I. 418, 198 A.2d 159. The Legislature may not deprive a litigant of any of the essential features of a jury trial that were available to a litigant at the time the Rhode Island constitution was adopted in 1842. Although our constitution does not expressly set forth the number of individuals that will constitute a petit jury, we can find the answer to this issue by tracing the history of jury trials in this state. We begin with the departure of Roger Williams from Massachusetts.

The first settlers coming to the area now known as Rhode Island arrived with Roger Williams in 1636 and established the community known as Providence. Later, three other towns were founded, Portsmouth in 1638, Newport in 1639 and Warwick in 1642. Durfee, *Judicial History of Rhode Island* at 1 (1883). Portsmouth set up a form of municipal government in 1639. Its basis was the law of England. There was a quarterly court of trials consisting of one judge and eight assistants. The Portsmouth ordinance provided for trials by a jury of twelve. "Small cases" were tried and decided by an assistant without a jury. 1 Field, *History of Rhode Island,* at 48 (1902).

In the fall of 1643, Roger Williams traveled to England seeking a charter. He arrived after the flight of Charles I. He was successful in obtaining a patent from the parliamentary government then in control. He returned to America in 1644 with a document known as the Parliamentary Patent or the Warwick Charter for Providence Plantations. This instrument authorized the union of the four settle-

ments into one government. 1 Carroll, *Rhode Island, Three Centuries of Democracy,* at 57 and 58 (1932). The General Assembly was established. A judicial system was organized. It was called the General Court of Trials. It had jurisdiction over the entire colony. It had the power to consider all aggravated offenses and such matters as the town courts might refer to the General Court as being "too weighty" for, a municipal tribunal to determine. The General Court also heard disputes between different towns and between citizens of different towns. All questions of fact were to be determined by a jury of twelve. 1 Bayles, *History of Providence County, Rhode Island,* at 31 (1891). The town court had original jurisdiction over controversies between its citizens. There is evidence that some of these courts used a six-man jury. Providence in 1653 and again in 1655 adopted an ordinance calling for the "tryal" of "causes" before a six-man panel. 2 *Early Records of the Town of Providence,* at 75 and 85 (1893). Warwick also provided for the use of six-man juries. *See,* Capwell, *Records of the Course of Trials of the Town of Warwick,* 1659-1674. While our research discloses at this stage of our state's development that a six-man jury was not unknown on the municipal level, it is clear that juries of twelve were required at all trials conducted in the General Court.

In 1663 the "English Colony of Rhode Island and Providence Plantations" received a Royal Charter from Charles II. It served as our constitution until the adoption of our present constitution in 1842. By the charter, the Legislature received a grant of the power to make laws thereunder but only "so as such laws, ordinances and constitutions, so made, be not contrary and repugnant unto, but, as near as may be, agreeable to the laws of this our realm of England, considering the nature and constitution of the place and people there." 2 Bartlett, *Rhode Island Colonial*

*Records* 1664-1677, at 9 (1857). This provision serves to highlight the influence exerted upon this state by the law of England.

Mindful of their English heritage and the admonition contained in the new charter, the General Assembly enacted legislation calling for a jury of "twelve able jury men" to sit at all sessions of the General Court of Trials. At that time the General Court of Trials held sessions during the months of October and May in Newport. 2 Bartlett, *Rhode Island Colonial Records* 1664-1677, at 26-27 (1857); 1 Arnold, *History of Rhode Island* 1636-1700, at 302 (1859). As litigation increased, the court began to meet in Providence and in Warwick. Juries in those locations were composed of twelve with "sixe jurymen" chosen from Warwick and "sixe jurymen" selected from Providence. 2 Bartlett, *supra* at 31.

After we received the Royal Charter, there is evidence that from the years 1647 through 1670, twelve-man juries were used in all the sessions of the General Court of Trials. *Rhode Island Court Records,* Vols. I and II.

At this point, we shall conclude our consideration of the judicial history of our state and, as we further construe the inviolability issue, invoke that well-known rule of construction which states that a constitution must be presumed to have been framed and adopted in the light and understanding of prior and existing laws and with reference to these laws. *Krutka* v. *Spinuzzi,* 153 Colo. 115, 384 P.2d 928; *Pfeiffer* v. *Board of Education,* 118 Mich. 560, 77 N.W. 250; *In re Upshaw,* 247 Ala. 221, 23 So.2d 861; *Idaho Mutual Benefit Ass'n, Inc.* v. *Robison,* 65 Idaho 793, 154 P.2d 156; *Herold* v. *Talbott,* 261 Ky. 634, 88 S.W.2d 303.

Our examination of the various acts adopted by the Legislature from the eighteenth century to 1842 shows an unwavering adherence to a petit jury composed of twelve persons. *See,* P. L. 1719 at 16-18; P. L. 1745-1752 at 81;

P. L. 1767 at 53; P. L. 1798, sec. 5 at 152; P. L. 1822, sec. 4 àt 117. The juries were assigned to such courts from our historical past as the "Superior Court of Judicature the Court of Assize and General Gaol Delivery," the "Court of Common Pleas" and the "Supreme Judicial Court."

In our consideration of your inquiry we have also been guided by the principle that the language of our constitution cannot be properly interpreted except by reference to the common law as it was when the constitution was adopted. *Grosjean* v. *American Press Co.*, 297 U. S. 233, 56 S.Ct. 444, 80 L.Ed. 660; *Ex Parte Grossman*, 267 U. S. 87, 45 S.Ct. 332, 69 L.Ed. 527. Further, in seeking to ascertain the meaning of the word "jury" as found in our constitution, we have looked to the history of the times as they were in 1842 when the Rhode Island constitution was adopted. *State of Rhode Island and Providence Plantations* v. *Commonwealth of Massachusetts*, 12 Peters 657, 9 L.Ed. 1233 (1838).

In and about 1842 a trial by jury was synonymous with a trial by a jury of twelve. *Briant* v. *Russel*, 1 Pennington, 135 (N.J. 1806); *Brown* v. *State*, 8 Blackford, 561 (Indiana 1847); *Work* v. *Ohio*, 2 Ohio St. 296 (1853); *Opinion of the Justices*, 41 N. H. 550 (1860); *State* v. *Cox*, 8 Ark. 436 (1848). At common law there were three attributes which distinguished a jury. They were (1) number — a jury was composed of twelve "no more and no less"; (2) impartiality — the jury was required to be impartial in its judgment; and (3) unanimity — its verdict had to be unanimous. *Carroll* v. *Byers*, 4 Ariz. 158, 36 P. 499; *Minnequa Cooperage Co.* v. *Hendricks*, 130 Ark. 264, 197 S.W. 280; *Carr* v. *Kinney*, 41 Hawaii 166; *People* v. *Kelly*, 347 Ill. 221, 179 N.E. 898; *State* v. *Sereg*, 229 Iowa 1105, 296 N.W. 231; *Branham* v. *Commonwealth*, 209 Ky. 734, 273 S.W. 489; *Lommen* v. *Minneapolis Gaslight Co.*, 65 Minn. 196, 68 N.W. 53; *Markham* v. *State*, 209

Miss. 135, 46 So.2d 88; *State* v. *McClear*, 11 Nev. 39 (1876); *State* v. *McCarthy*, 76 N.J.L. 295, 69 A. 1075; *Commonwealth* v. *Collins*, 268 Pa. 295, 110 A. 738; *Lovings* v. *Norfolk & W. Ry.*, 47 W.Va. 582, 35 S.E. 962; *First Nat'l Bank* v. *Foster*, 9 Wyo. 157, 61 P. 466.

In 1966, this court ruled that the constitutional right to a trial by jury guarantees trial by an impartial jury. *State* v. *Pella*, 101 R. I. 62, 220 A.2d 226. It has been the rule in this jurisdiction since the time "when man's memory runneth not to the contrary," that a jury's verdict has had to represent the unanimous choice of the jury. Shortly after the turn of the century, the court in *Gunn* v. *Union R.R.*, 27 R. I. 320 at 325, 62 A. 118 at 120, referred to the inviolability clause and asked "What, then, is the meaning of the words 'trial by jury?'" Having asked the question, the court furnished its own answer by citing the following definition found in *Capital Traction Co.* v. *Hof*, 174 U. S. 1 at 13-14, 19 S.Ct. 580 at 585, 43 L.Ed. 873 at 877-78:

> " 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions * * * is a trial by a jury of *twelve* men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence. This proposition has been so generally admitted, and so seldom contested, that there has been little occasion for its distinct assertion. Yet there are unequivocal statements of it to be found in the books." (emphasis ours.)

It is a fact, therefore, that our court has in the past accorded official recognition to two of the three characteristics found in all common-law petit juries.

We have examined the constitutions of other states. In our review, we note that many of their constitutions contain clauses similar to article I, section 15 of our own con-

stitution. In construing that particular section, the courts of these states have held that the inviolate clause of their constitution preserves a right to a trial by a twelve-man jury. *Alford* v. *State*, 170 Ala. 178, 54 So. 213; *State* v. *Scheminisky*, 31 Idaho 504, 174 P. 611; *Povlich* v. *Glodich*, 311 Ill. 149, 142 N.E. 466; *State* v. *Wells*, 69 Kan. 792, 77 P. 547; *Markham* v. *State, supra; State* v. *James*, 96 N. J. L. 132, 114 A. 553;[3] *In re Kortgaard*, 66 N. D. 555, 267 N.W. 438; *William Goldman Theatres, Inc.* v. *Dana*, 405 Pa. 83, 173 A.2d 59; *State* v. *Ross*, 47 S. D. 188, 197 N. W. 234; *Grooms* v. *State*, 221 Tenn. 243, 426 S.W.2d 176. In only one instance have we found that a legislative act reducing the number of jurors from twelve to six was upheld despite the inviolate clause of a state's constitution. *State* v. *Cowart*, 251 S. C. 360, 162 S.E.2d 535. In taking this position, the court pointed out, however, that there was a second section of the South Carolina constitution which provided for a six-man jury for trials in certain "inferior courts" in that state and no attempt was made to reconcile the two clauses.

We have also turned to our neighboring states of Massachusetts and Connecticut for guidance. Article XV of the Massachusetts constitution, in speaking of the right to a trial by jury described therein, says that it shall be "sacred." When this article was construed, it was held that the trial by jury preserved thereunder was the common-law trial by jury "in its essential characteristics" as they were known and understood at the time the constitution was adopted. *Bothwell* v. *Boston Elevated Ry. Co.*, 215 Mass. 467, 102 N.E. 665. Connecticut has had two constitutions. Its first was adopted in 1818. Its second was

---

[3]The New Jersey Supreme Court has recommended that its state's constitution be amended so as to authorize the Legislature either to reduce the number of jurors required or to eliminate the right to a jury trial in civil cases and to authorize the trial of criminal cases by a jury of six. 94 N. J. L. J. at 309 (April 22, 1971).

adopted and became effective in 1965. Both documents speak of the right to a jury trial as being inviolate. Article I, section 21, 1818 constitution; article I, section 19, 1965 constitution. In *State* v. *Perrella,* 144 Conn. 228, 129 A.2d 226, the court said that it would "assume" that the jury-trial.provisions of the state's constitution (which are about identical to ours) included the availability to litigants of a jury made up of a dozen people. Earlier, the court did rule that the inviolability clause in its 1818 constitution was a guarantee that there would be no changes in the "essential features" of a jury trial as they were derived from "our ancestors" and now exist by force of the "common law" as a political right. *State* v. *Gannon,* 75 Conn. 206, 52 A. 727.

Although the Supreme Court in *Williams*[4] described the common-law requirement that a petit jury be composed of precisely twelve people as an "historical accident," the Court obviously could not share this observation made in June 1970 with the framers and adopters of the Rhode Island constitution. Accident or not, it is our firm belief that in 1842 when the draftsmen and the voters said that the right to a jury trial was to remain inviolate, they were extending to an accused, or any litigant who might be entitled to a jury trial, the immutable right to have his case considered in the courts of this state by a petit jury composed of exactly twelve persons. We are cognizant that the financial burden to the state, as it makes the

---

[4]*Williams* leaves unanswered two questions. One, is how far down the numerical scale can a legislature go before it will be said that the number selected is so low that one's right to a jury trial has been effectively nullified. Secondly, the Court's reference to the deletion in 1879 of the "unanimity" requirement brings into issue the viability of an element of a jury trial long considered an essential part thereof. It will be interesting to see whether a state's statute or constitutional provision calling for something less than a unanimous verdict will experience any difficulty satisfying the jury-trial provisions of the sixth amendment.

necessary expenditure to insure that an adequate supply of citizens will be available for twelve-member juries, is a substantial one. This facet of the problem may be solved by an amendment to the constitution which will permit the use of a petit jury composed of a number less than twelve people. The fiscal problem, however, is beyond our pale. The guarantees relative to a jury trial are found in the Declaration of Constitutional Rights of our state's constitution. The preamble thereto discloses "* * * that the essential and unquestionable rights and principles hereinafter mentioned * * * shall be of paramount obligation in all legislative, judicial, and executive proceedings." It is because of this "paramount obligation" that we conclude that the question propounded to us and set forth above must be answered in the negative so far as the Federal Constitution is concerned and in the affirmative as it applies to the Rhode Island constitution.

THOMAS J. PAOLINO<br>
WILLIAM E. POWERS<br>
ALFRED H. JOSLIN<br>
THOMAS F. KELLEHER

I reluctantly disagree with the conclusion reached by my brothers that the Legislature of this state is prohibited by the provisions of article I, section 15, of the constitution from prescribing the number of jurors required to constitute a petit jury. That this conclusion is a result of an exhaustive and scholarly examination of supporting authorities on that question, I concede. I am moved to say that, as a conventional approach to an interpretation of section 15 of article I of the constitution of this state, the opinion to which my brothers subscribe constitutes indeed a formidable traditionalist manifesto.

I am not aware, however, that this court has ever been confronted with the precise question whether the General Assembly is constitutionally prohibited by section 15 of

article I from prescribing the numerical constitution of a petit jury. I concede that in *Mathews* v. *Tripp*, 12 R. I. 256, 258, this court did say that, "Trial by jury is a well known kind of trial. * * * And the right remains inviolate so long as the jury continues to be constituted *substantially* as the jury was constituted when the Constitution was adopted * * *." (Italics mine) However, I am encouraged in expressing an opinion contrary to that of my brothers by the fact that the learned court in that case did not state a precise number but used the word "substantially" when referring to the constitution of a jury, as I am encouraged by the fact that in that case the question of the power of the Legislature to prescribe the numerical constitution of a jury was not in issue.[1]

I must say that I am encouraged also by the knowledge that James Wilson of Pennsylvania, a member of the Constitutional Convention which framed the Federal Constitution, one of the framers of the constitution of the Commonwealth of Pennsylvania, and one of the first members of the Supreme Court of the United States, said: "When I speak of juries, I feel no peculiar predilection for

---

[1]In *Gunn* v. *Union R.R.*, 27 R. I. 320, 325, 62 A. 118, 120, this court quoted from *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 13, 19 S.Ct. 580, 585, 43 L.Ed. 873, 878, to the effect that trial by jury "is a trial by a jury of twelve men * * *." In *Patton* v. *United States*, 281 U. S. 276, 50 S.Ct. 253, 74 L.Ed. 854, the United States Supreme Court, also quoting from *Capital Traction*, held that a jury trial required a jury composed of twelve and went on to say at 290, 50 S.Ct. at 255, 74 L.Ed. at 859: "These common law elements are embedded in the constitutional provisions above quoted, and are beyond the authority of the legislative department to destroy or abridge." It would appear, however, that the authoritative thrust of these cases has been nullified, at least in criminal cases, by the decision of the United States Supreme Court in *Williams* v. *Florida*, 399 U. S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, where the Court, speaking through Mr. Justice White, said: "We hold that the 12-man panel is not a necessary ingredient of 'trial by jury,' and that respondent's refusal to impanel more than the six members provided for by Florida law did not violate petitioner's Sixth Amendment rights as applied to the States through the Fourteenth." *Id.* at 86, 90 S. Ct. at 1898, 26 L.Ed.2d at 452-53.

the number twelve * * *."[2] In this state of mind I venture to express an opinion on the question submitted by the Senate contrary to that of my colleagues.

I start with the proposition that the question raised is not whether the framers of the constitution, in providing that "The right of trial by jury shall remain inviolate," intended to fix constitutionally the numerical constitution of a petit jury at the traditional common-law number of twelve. Rather, in my opinion, the thrust of the inquiry is whether section 15 of article I was intended to prohibit the Legislature from continuing thereafter to exercise its long-standing power to fix the number of jurors that would constitute a petit jury, a power that I conceive was conferred upon it by the plenary grant of authority in the Royal Charter to promulgate laws and establish courts within the colony.

The Royal Charter, clearly organic legislation, did not mandate the numerical constitution of a petit jury nor, for that matter, does the constitution of this state. The absence of such a mandate from either document persuades me that neither the Crown, in promulgating the charter, nor the convention, in framing the constitution, demonstrated an intention to constitutionally prescribe the number of jurors constituting the petit jury nor, in the case of the Constitutional Convention, to prohibit the Legislature from continuing to so do. Obviously, had the framers of the constitution intended to mandate the numerical constitution of a petit jury as it stood at common law, they would have used language appropriate to effectuate that intention.[3]

The provisions of the Royal Charter conferring upon the

---

[2]II Andrews, *The Works of James Wilson,* at 162.

[3]For example, the constitution of Pennsylvania provides: "Trial by jury shall be as heretofore, and the right thereof remain inviolate." Constitution of 1874, article I, section 6.

Legislature of the colony authority to enact laws and establish a judicial system persuade me that the intention of that document was to grant to the Legislature authority to prescribe from time to time the numerical constitution of a petit jury. I do not perceive that any provision of the constitution, either in express terms or by necessary implication, prohibits the continued exercise by the Legislature of the power to prescribe the number of persons required to constitute a petit jury.

The charter of King Charles II, a classic example of ministerial verbosity, conferred upon the colonial Legislature broad powers to make laws and establish courts. As to the law-making power, the charter, in pertinent part, reads: "* * * and from time to time, to make, ordain, constitute or repeal, such laws, statutes, orders and ordinances, forms and ceremonies of government and magistracy, as to them shall seem meet * * * so as such laws, ordinances and constitutions, so made, be not contrary and repugnant unto, but as near as may be, agreeable to the laws of this our realm of England, considering the nature and constitution of the place and people there * * *."

The charter then gave plenary power to the Legislature to establish a system of courts of judicature, saying: "* * * and also to appoint, order and direct, erect and settle, such places and courts of jurisdiction, for the hearing and determining of all actions, cases, matters and things, happening within the said colony and plantation, and which shall be in dispute, and depending there, as they shall think fit * * *."

It is clear, then, that the Royal Charter gave broad and comprehensive authority to the colonial Legislature to establish courts and the jurisdiction thereof and to provide for the hearing and determining of cases "as they shall think fit." History discloses that in an early period the Legislature sat as a Court of Appeals and regularly heard

and determined such appeals, acting pursuant to the charter provisions. However, early in the eighteenth century the Legislature appears to have relinquished its claim of authority to act as a Court of Appeals to determine appeals from the General Court of Trials. The court noted that, "* * * although the charter gave them very ample powers to make laws and constitute courts of judicature, yet that they had not the power to constitute themselves a Court * * *." This is to be found in *Opinion of the Supreme Court,* 3 R. I. 299, dated June 14, 1854, on the constitutionality of an act of the Legislature which purported to reverse and annul the judgment of the Supreme Court of Rhode Island for treason rendered against Thomas W. Dorr on June 25, 1844.

I am persuaded that this determination by the Legislature itself as to the extent of the power conferred upon it by the Royal Charter to establish courts for the hearing and determining of all cases "as they shall think fit" makes clear its conclusion that the power conferred enabled the Legislature to prescribe the form and structure of such trials, including the power to designate the number of jurors that would constitute a petit jury. I agree that the admonition contained in the charter that whatever laws were made by the colonial Legislature were to be reasonably agreeable to the laws of England contemplated the establishment of jury trials in the colony. Certainly the broad phrase that they should be established "as they shall think fit" conferred upon the Legislature the right to regulate such trials and, in so doing, to prescribe the numerical constitution of petit juries.

As my brothers' opinion discloses, the colonial Legislature, in exercising the power to establish courts of judicature, "* * * enacted legislation calling for a jury of 'twelve able jury men' to sit at all sessions of the General Court of Trials." They further noted that on at least five occa-

sions during the seventeen hundreds and eighteen hundreds the Legislature enacted legislation in which it prescribed the numerical composition of a petit jury at twelve. It is clear, then, that the colonial Legislature undertook to exercise the power conferred upon it by the charter to establish courts for the determination of cases by, among other things, prescribing the numerical constitution of petit juries. It is my opinion, then, that in this colony juries were not constituted according to the common law but were juries constituted pursuant to the enactment of statutes by the Legislature empowered by the charter to so do. What is important here is not that the Legislature prescribed the number twelve as required to constitute a jury but that the Legislature, in an exercise of its legislative power, prescribed the number as constituting a petit jury.

On May 4, 1776, this state declared its independence from England, and our Legislature became the repository of all the power of the Crown and Parliament. *Payne & Butler* v. *Providence Gas Co.,* 31 R. I. 295, 77 A. 145. It would appear, then, that after this state declared its independence and before the constitution of 1842 was adopted, the Legislature of this state exercised its powers limited only by the Constitution of the United States. In *City of Providence* v. *Moulton,* 52 R.. I. 236, 242, 160 A. 75, 77, this court said: "Eminent jurists and lawyers have said that the powers of the general assembly under the charter were limited only by the constitution of the United States." The court also, referring to *Wilkinson* v. *Leland,* 2 Peters, 631, 632, quoted a learned Rhode Island counsel, a Mr. Whipple, who said: " 'No other limit to the power of the legislature is known, other than that which is marked out by the constitution of the United States.' " *Id.* at 243, 160 A. at 78.

I find inescapable the conclusion that at the time the

Constitutional Convention met to frame a constitution for this state in 1842, it was well aware that the power to prescribe the number of persons that should properly constitute a petit jury was in the General Assembly and had long been exercised by it. The question, then, in my opinion, is whether the convention at that time, in framing the constitution, intended to prohibit therein continued exercise of this power by the Legislature. Considering this question, it is of utmost importance to keep in mind the well-established principle that the constitution of this state, like that of other states, was one of limitation and that the powers possessed by the Legislature remained therein except as they were limited by the provisions of the constitution of 1842.

The Constitutional Convention in 1842, disclosing its acceptance of the political philosophy of Montesquieu concerning the necessity for an independent judiciary, made specific provisions in that document for the separation of governmental powers. In article III, the constitution provides: "The powers of the government shall be distributed into three departments: the legislative, executive and judicial." It is settled that the distribution of powers among the three departments of government precludes an exercise of the judicial power by the Legislature. *Opinion of the Supreme Court, supra.*

In *G. & D. Taylor & Co.* v. *Place,* 4 R. I. 324, 348, speaking of the provision for a distribution of the powers of government, Chief Justice Ames said: "It is quite evident, too, that this distribution of powers was, in our constitution, made for the special purpose of depriving the general assembly of their long exercised judicial power, which, rightly or wrongly, that body had assumed under the charter." If, as the Chief Justice noted, it was the "special purpose" of the convention, in providing for a separation of powers, to deprive the General Assembly of

the right assumed by it to exercise judicial power, it is significant to me that the convention did not in similar fashion, in adopting article I, section 15, specifically deprive the Legislature of its long-exercised power to prescribe the numerical constitution of a petit jury.

In proceeding to establish and delineate the powers of the judicial department, the convention provided in article X, section 1: "The judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish." It is significant that the convention elected to create but one constitutional court, the Supreme Court. It then conferred upon the Legislature the same power that had been conferred upon it by the Royal Charter of 1663, that is, the power to ordain and establish such inferior courts as it deems necessary. It is difficult to conclude other than that the framers, fully aware of the powers long possessed and exercised by the Legislature in the establishment of courts, intended to continue that power in the Legislature to provide for jury trials and to prescribe the numerical constitution of the juries.

However, the Legislature went further and, in delineating the powers that would be exercised by the legislative department, in article IV, section 10, said: "The general assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this constitution." Our inquiry, then, must be directed toward the effect of article I, section 15, which provides: "The right of trial by jury shall remain inviolate." Does this provision of section 15, either in express terms or by necessary implication, constitute a prohibition of the Legislature's right to continue to prescribe the numerical constitution of petit juries?

In *City of Providence* v. *Moulton, supra,* this court said, with reference to section 10 of article IV: "The constitu-

tion defines the powers given to the executive and the judicial departments of the government. All other powers of government are given to the legislative department, unless prohibited in the constitution." *Id.* at 241, 160 A. at 77. There is but one provision of our constitution that could reasonably be construed as having been intended to proscribe the long-standing power of the General Assembly to provide for the manner and form of a jury trial. That would be article I, section 15, the inviolate clause, so called.

Was it then the purpose of the 1842 convention in framing the inviolate clause to deprive the General Assembly of its long-exercised authority to prescribe the number of persons that would constitute a petit jury? I think not. The inviolate clause, in my opinion, was intended to constitutionally preserve only the essentials and not the acccidentals of jury trial. I conceive the essentials of a jury trial to be that the jury consist of multiple fact finders impartial in the cause, who have been selected by an impartial process, who are guided as to the applicable law by the instructions of a judge presiding over them, and who are unanimous in decision. I do not accept the view that it is essential to the right of jury trial that the fact finders should number precisely twelve. The number of such fact finders, in my opinion, is purely an accidental and goes merely to the form of an exercise of the right and not to its substance.

The historical context in which constitutional conventions moved to preserve the right to trial by jury, including the seventh amendment to the Constitution of the United States as well as those of the several states, is persuasive that these conventions intended almost universally to preserve the substance of a jury trial but that, where such intention included the preservation of the form thereof, specific provisions were inserted to accomplish that purpose.

In *Galloway* v. *United States,* 319 U. S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458, the Court was considering whether a directed verdict for the defendant deprived the plaintiff of his right to jury trial under the seventh amendment to the Constitution of the United States. The Court said at 390, 63 S.Ct. at 1087, 87 L.Ed. at 1471: "The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing." Again, at 392, 63 S.Ct. at 1088, 87 L.Ed. at 1472, the Court said concerning the purpose for which the seventh amendment was included in the Constitution: "The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial *in only its most fundamental elements,* not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." (Italics mine)

While the Court in this case was discussing the intention of the framers with respect to the seventh amendment to the Federal Constitution, it is my opinion that the same conclusions may be drawn with respect to the framers of article I, section 15. I am compelled to conclude that had the convention in 1842 intended to deprive the Legislature of its right to prescribe the form and manner in which jury trials were to be conducted, it would have used appropriate language to deprive the General Assembly of that right.

It might well be said that the function of the inviolate clause in our constitution is to exclude judges from an exercise of the fact-finding power of the jury so far as it is practicable. I am aware of nothing in the history of the colonial period that justifies the conclusion that the

right of jury trial was being impaired by attempts to reduce the number of fact finders constituting a jury. Neither am I aware that any discussion of such a reduction in the number of fact finders was ever considered by the convention in its deliberations.

The history of the era, both in England and in colonial America, discloses a persistent development of devices by which the courts sought to control or to negate the verdicts of juries. In *Galloway, supra,* at 397, 63 S.Ct. at 1090, 87 L.Ed. at 1474, Mr. Justice Black, dissenting, and referring to the seventh amendment, said: "The founders of our government thought that trial of fact by juries rather than by judges was an essential bulwark of civil liberty. For this reason, among others, they adopted Article III, §2 of the Constitution, and the Sixth and Seventh Amendments." It is my opinion that Mr. Justice Black stated with characteristic clarity the prime question that confronted state constitutional conventions seeking to preserve the right of trial by jury as distinguished from trial by the court. What the state conventions, as well as the federal convention, were attempting to constitutionally guarantee to the people was "trial of fact by juries rather than by judges."

It is my conviction also that in enacting the inviolate clause the 1842 convention intended to preserve to the people the ancient right of juries to return general verdicts despite the orders of the court to do otherwise. The character of the problem confronting the framers in 1842 was probably aptly described by the language of Mr. Justice Black and Mr. Justice Douglas in 374 U. S. at 865. These eminent jurists were opposing amendments to Rule 49 of the Federal Rules of Civil Procedure pursuant to which judges are authorized to require juries to return only special verdicts or to answer written interrogatories. They went on to say at 867: "Such devices are used to impair or·

wholly take away the power of a jury to render a general verdict. One of the ancient, fundamental reasons for having general jury verdicts was to preserve the right of trial by jury as an indispensable part of a free government. Many of the most famous constitutional controversies in England revolved around litigants' insistence, particularly in seditious libel cases, that a jury had the right to render a general verdict without being compelled to return a number of subsidiary findings to support its general verdict. Some English jurors had to go to jail because they insisted upon their right to render general verdicts over the repeated commands of tyrannical judges not to do so."

It would serve no useful purpose to extend this opinion by a discussion of the history of the judicial incursions into the province of the jury in eighteenth-century England or in colonial America. Doctor Edith Guild Henderson in her exhaustive and scholarly study of the background of the seventh amendment has delved deeply into that history and has analyzed the practice, both in the colonies and in England, in the conduct of jury trials and the development of devices for controlling or negating jury verdicts by the court.[4] Her observation with respect to these developments is enlightening on the motivation of those charged with the framing of constitutions for the American states, particularly with respect to the adoption of inviolate clauses.

At page 321 of her article Dr. Henderson says: "Well before the American Revolution the rule was established in England that a jury could always acquit generally. *Bushell's Case* (Vaugh. 135, 124 Eng. Rep. 1006 [C.P. 1670]) has been taken as authority that jurors could not be punished for a verdict of not guilty even if it was against the evidence and against the court's directions.

---

[4]Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289 (1966).

The defendant, of course, also went free; no new trial lay after an acquittal." Further, at page 326, Dr. Henderson states: "Taking the Anglo-American system of criminal procedure as a whole, therefore, it seems that the jury's right 'to decide the law' or to give an uncontrolled general verdict was primarily a right to acquit."

I cannot escape the conclusion that the convention in 1842 was concerned primarily with preserving to the people the right of the jury to return an uncontrolled general verdict or to exercise the right to acquit. In this right lay the protection against tyranny and oppression that made the right to jury trial what Jefferson described as "* * * the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution"[5] Galloway v. United States, supra, at 397, n. 1. I am fully persuaded that what the convention of 1842 intended should remain inviolate was this right of the jury to return a general verdict without the intervention of judicial control over these verdicts other than as such control was exercised at the time the inviolate clause was adopted. I again direct attention to Dr. Henderson's lucid discussion of the devices to control or negate jury verdicts used during the colonial period.

In pressing this contention, I refer to the historic invasion of the jury's right to return a general verdict in the criminal libel cases of the eighteenth century. The struggle of the English people to restore and preserve the right of juries in criminal libel cases to return a general verdict culminated in the enactment by Parliament of Fox's Libel Act.[6] As Dr. Henderson notes at 328 concerning the criminal libel cases: "The government of England at this time was oligarchic, corrupt, and of course not yet reformed. * * * Free speech was not yet an accepted prin-

---

[5] 3 Writings of Thomas Jefferson (Washington ed.) 71.

[6] 32 Geo. 3, chap. 60 (1792).

ciple of the British constitution, indeed, the government, fearing first Jacobite treason and later Parliamentary reform, tended to see every criticism. of its policies as a seditious plot. Even abstract discussion of political theory was sometimes treated as a crime."

In the criminal libel cases the courts undertook a determined attack upon the right of the jury to return a general verdict by requiring them specifically to find only a special verdict as to the publication of the allegedly libelous document. The judges based this authority on the contention that the question of whether the publication was libelous or not was one of law for the court. This obviously was to deprive the jury of the right to determine whether the publication were truthful and published without malice and thereon return a general verdict. The parliamentary act, Fox's Libel Act, secured to juries, upon the trial of indictments for libel, the right of pronouncing a general verdict of guilty or not guilty upon the whole matter in issue and no longer bound them to find a verdict of guilty on the proof of the publication of the paper charged to be a libel and of the sense ascribed to it in the indictment.

The constitution of 1842 was motivated in preserving the rights of juries to return general verdicts and to acquit, I am sure, by their awareness of the invasion of this right and its oppressive consequences in the criminal libel cases. I am buttressed in this conclusion by the fact that in article I, section 20, of our constitution, the convention, in guaranteeing freedom of the press, went on to provide specifically: "* * * and in all trials for libel, both civil and criminal, the truth, unless published from malicious motives, shall be sufficient defence to the person charged." It seems clear that this insertion into our constitution of the provision guaranteeing that truth of a publication would be a defense against an action for libel was intended

by the convention to secure to juries in such cases the absolute right to return a general verdict.

I am persuaded, then, that the inviolate clause was never intended by the convention of 1842 as a limitation to the long-standing right of the Legislature to prescribe the numerical constitution of a petit jury. That clause was, in my opinion, adopted for the purpose of preventing the Legislature and the courts from impairing or prohibiting the right of a jury to return general verdicts free from control or negation by the courts other than as such judicial power was exercised at the time of the adoption of that constitution.

Finally, I must direct attention to the fact that the Legislature of this state has been fixing the number of jurors that would constitute a petit jury at least since 1905 in The Court and Practice Act of 1905, section 108, to the present in G. L. 1956 (1969 Reenactment) §9-10-12. I direct attention also to §9-10-13 where the Legislature provided for the use of alternate jurors. In my opinion, this action is entirely consistent with my contention that the Legislature has the power to fix the number of jurors that shall constitute a petit jury.

And I do not wish to be understood as overlooking the holding of this court in *Mandeville, Brooks & Chaffee* v. *Fritz,* 50 R. I. 513, 149 A. 859, and in *Dyer* v. *Keefe,* 97 R. I. 418, 198 A.2d 159, in which this court held that the Legislature has a right to impose reasonable conditions upon the exercise of the right to a jury trial. These cases are not inconsistent with my viewpoint as to the power of the Legislature for, in my opinion, the fixing of the number of jurors which shall constitute a petit jury is merely regulatory of the exercise of the right to a jury trial.

I am of the opinion, then, that the Carolinian Charter of 1663 vested the Legislature of the colony with the power to prescribe the numerical constitution of a petit jury;

that this power passed to the Legislature of this state at the time of our Declaration of Independeuce on May 4, 1776, and was exercised by the Legislature of this state until the adoption of our constitution in 1842; that the provisions of the inviolate clause, section 15 of article I, of our constitution neither expressly nor by necessary implication prohibit the exercise of that power by the Legislature pursuant to the provisions of article IV, section 10, of our constitution; and that, therefore, the question propounded to us should be answered in the negative as to both the Federal Constitution and the constitution of this state.

THOMAS H. ROBERTS