403 A.2d 649.

STATE *vs.* MICHAEL B. VACCARO.

JULY 3, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

BEVILACQUA, C.J.   In this criminal appeal we are asked to determine whether state and federal constitutional prohibitions against cruel and unusual punishment are violated by the imposition of a mandatory life sentence. We are also requested to decide whether the "right of allocution" contained in art. I., §10, of our state constitution grants to the Superior Court the power to mitigate a punishment previously established by the Legislature.

The record reveals that defendant was tried and convicted in Superior Court of first-degree murder and sentenced to a mandatory term of life imprisonment.[1] Under the terms of G.L. 1956 (1969 Reenactment) §12-19-11, this sentence shall not be suspended and defendant shall not be placed on probation.[2]

---

[1]The statute in effect during the relevant time period, G.L. 1956 (1969 Reenactment) §11-23-2, provided in pertinent part:

> "Every person guilty of murder in the first degree, unless he shall then be under sentence of imprisonment for life, shall be imprisoned for life."

[2]The defendant could, however, eventually be eligible for parole under the terms of G.L. 1956 (1969 Reenactment) §13-8-13, as amended by P.L. 1975, ch. 190, §1.

Prior to sentencing, the following colloquy took place between the court and defendant:

"The Court:        Do you care to be heard before I pronounce sentence?

"The Defendant:   If you're going to pronounce sentence, I know first degree murder is life.

"The Court:        You know I have no choice.

"The Defendant:   Yes. You have a job to do. Nothing else I can say would change the statute that there is. You may go ahead and pronounce sentence."

The defendant contends that this exchange rings hollow in the face of the right of allocution. He asserts that §12-19-11 by imposing a mandatory sentence without suspension or probation, infringes on judicial discretion in the sentencing process and thus violates the right of allocution contained in art. I, §10. Under defendant's analysis, proper preservation of this right necessarily implies in the judiciary the power to indefinitely suspend execution of a sentence.

An extensive discussion of the history and development of the right of allocution both at common law and as embodied in the Rhode Island Constitution is provided in the following passages from *Robalewski* v. *Superior Court*, 97 R.I. 357, 359-60, 197 A.2d 751, 753-54 (1964):

"[T]he common-law right of allocution which in ancient times, at least in capital cases, made it mandatory that inquiry be made of an accused as to why the sentence of death should not be pronounced upon him and afforded to an accused an opportunity on his own behalf to offer matters in arrest of judgment and in extenuation of guilt or mitigation of his conduct. 1 Chitty, Criminal Law (3d Am.ed.), p.700. It developed in England at a time when a prisoner was denied the right to defend by counsel upon a plea of not

guilty as to issues of fact in felony and treason cases. In those times it was the obligation of the judge to look after the interest of the criminal defendant, to examine witnesses on his behalf and to guard against an illegal or unjust conviction. 1 Chitty, *supra,* at 407.

"Although by what we consider the better view the reason for the inquiry fell once the accused was given the right to counsel, *Dutton v. State,* 123 Md. 373, *Warner v. State,* 56 N.J.L. 686, *State v. Johnson,* 67 N.C. 55, *Sarah v. State,* 28 Ga. 576, the necessity for granting him the liberty to speak in his own behalf at the time of imposition of sentence still obtained, *State v. Hoyt,* 47 Conn. 518, 544, and it was in recognition of that necessity that the liberty was guaranteed by art. I, sec. 10, of the constitution. If the contemplation had been otherwise, the pattern of art. VI of the amendments to the federal constitution, upon which art. I, sec. 10, is molded, would have been followed and the liberty would not have been included.

"The guarantee in art. I, sec. 10, differs, however, from the ancient right. It is broader and narrower. What once was confined to capital cases has been extended to all criminal prosecutions and to inquire is no longer mandatory. Construing it as we do, the constitutional liberty includes the right of an accused, as he stands at the bar after conviction awaiting imposition of sentence, to bring to the attention of the court those matters which one in his position could at common law have spoken when inquiry was made as to why sentence should not be imposed.

\* \* \*

"That [the liberty] cannot be denied does not mean that it can be availed of without restriction or that its enjoyment is not subject to reasonable regulation. Abridgement, however, should be exercised with care and caution and curtailment should not take place until the accused, or counsel, or both if appropriate, have had a fair and full opportunity to bring to the court's

attention all information germane and of possible assistance in the determination of the sentence to be imposed. No hard or fast rule can be adopted. What is reasonable in one case may be unreasonable in another. Each case must be decided on its facts and in each instance the adoption of limitations is subject to a judicial discretion. *Driver v. State*, 201 Md. 25, 92 A.2d 570; *Zeff v. Sanford*, D.C. 31 F. Supp. 736, 738."

The record in the present case reveals that defendant was given an opportunity to address the court prior to sentencing. Defense counsel was also present at this stage of the proceedings. The defendant contends, however, that the mere procedural oportunity to speak fails to satisfy the right of allocution's substantive scope. Specifically, defendant asserts that at common law the right imparted the sentencing court with the power to create alternative punishments. According to defendant, a similar judicial power was contemplated by the framers of our state constitution when the right of allocution was embodied in art. I, §10.

In determining the scope of a right embodied in our state constitution, we refer to common-law practice as it existed at the time our constitution was adopted. *Opinion to the Senate*, 108 R.I. 628, 637, 278 A.2d 852, 856 (1971). At common law, a criminal defendant could plead several matters in arrest of judgment through the vehicle of allocution. These included benefit of clergy, insanity, pregnancy, or a simple demurrer. 4 Blackstone, *Commentaries*, 395-96. The common-law court did not, however, enjoy the independent power to override a legislatively mandated sentence with discretionary sentencing. 1 Chitty, *Criminal*, (3d ed.) 700.

The judiciary could only issue a temporary reprieve. *See Ex parte United States*, 242 U.S. 27, 43, 37 S.Ct. 72, 74-75, 61 L.Ed. 129, 141 (1916), *citing* 4 Blackstone, *Commentaries* 394-95; 2 Hale *Pleas of the Crown* 412. The ultimate decision to pardon a criminal defendant lay with the King. Although the sovereign gave great deference to the court's

recommendation of clemency, the power to adjust an otherwise mandatory punishment rested with the Crown. 1 Chitty at 700.

Applying this historical basis we conclude that the right of allocution as contained in art. I, §10 does not vest in the judiciary the power to fashion discretionary sentences independently. The Legislature has the constitutional authority to define and punish criminal conduct, including the imposition and execution of sentences, *Hazard* v. *Howard,* 110 R.I. 107, 111, 290 A.2d 603, 606 (1972), subject to state and federal constitutional limitations. *State* v. *Jorjorian,* 82 R.I. 334, 339, 107 A.2d 468, 470-71 (1954). We therefore hold that §12-19-11 does not violate art. I, §10 of the Rhode Island Constitution.

## II

We now direct our attention to defendant's challenge that mandatory life imprisonment constitutes cruel and unusual punishment. In a series of recent decisions examining the constitutionality of capital punishment, the United States Supreme Court has discussed at length the critical import of the Eighth Amendment's proscription against "cruel and unusual punishment." *See Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Coker* v. *Georgia,* 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977); *Woodson* v. *North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 859 (1976); *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

From these decisions we can distill the broad principle that the Eighth Amendment, as applied through the Fourteenth Amendment, prevents a state from exacting not only "barbaric"[3] punishments, but also those that are "excessive."

---

[3]No serious claim is made by the defendant that life imprisonment constitutes the type of "barbaric" punishment historically held to be inhumane. *See, e.g.,*

*Coker* v. *Georgia,* 433 U.S. at 592, 97 S. Ct. at 2865, 53 L. Ed. 2d at 989. A punishment will be deemed excessive if it:

> "(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." *Id.* at 592, 97 S. Ct. at 2865, 53 L. Ed. 2d at 989.

We will not, however, invalidate a particular penalty because we feel that a less severe sanction will satisfactorily accomplish society's penological purposes. *See Furman* v. *Georgia,* 408 U.S. at 451, 92 S. Ct. at 2834-35, 33 L. Ed. 2d at 472. (Powell, J., dissenting). Our function is limited to determining whether the challenged penalty is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg* v. *Georgia,* 428 U.S. at 183-84, 96 S. Ct. at 2929, 49 L. Ed. 2d at 880.

The desire to exact "deserving" punishment from criminal offenders is an expression of the basic human instinct for retribution. With regard to criminal law, this instinct must, by necessity, be channeled into the sentencing process in order to preserve stability and avoid reliance upon self-help to accomplish vindication. *See Furman* v. *Georgia,* 408 U.S. at 308, 92 S. Ct. at 2761, 33 L. Ed. 2d at 389. (Stewart, J., concurring). The Legislature's decision that a mandatory life sentence is an appropriate sanction for deliberate homicide reflects the community's belief that it is an appropriate response for the taking of a human life.

The question of the deterrent effect of a mandatory life sentence is a more complex issue. The United States Supreme Court has noted that no convincing empirical evidence has been produced to support or refute the validity of the death penalty. *See Gregg* v. *Georgia,* 428 U.S. at 184-85, 96 S. Ct.

---

*Chambers* v. *Florida,* 309 U.S. 227, 60 S. Ct. 472, 84 L. Ed. 716 (1940) (rack, thumbscrew); *Weems* v. *United States,* 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910) (chains); *In Re Kemmler,* 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890) (burning at stake); *Jackson* v. *Bishop,* 404 F.2d 571 (8th Cir. 1968) (flogging).

at 2930, 49 L. Ed. 2d at 881. We therefore make the analogous assumption that while a life sentence may not deter certain individuals who may be intent on taking a human life, it can also be said with equal certainty that the sanctions do serve as a deterrent for others.

In the face of these ambivalent factors, we do have a legislative determination that mandatory life sentences may be effective deterrents in first-degree murder situations. It is the primary function of the Legislature, and not the courts, to evaluate the social utility of a particular sanction. *Furman* v. *Georgia*, 408 U.S. at 403-405, 92 S.t Ct. at 2811, 33 L. Ed. 2d at 444-45. (Burger, C.J., dissenting). One cannot say that the Legislature's judgment in this case is clearly wrong.

Neither can we say that a mandatory life sentence is disproportionate to the crime of first-degree murder. In *Gregg* v. *Georgia*, 428 U.S. at 186-87, 96 S. Ct. at 2931, 49 L. Ed. 2d at 882, the United States Supreme Court held that capital punishment, the most drastic punishment, is not considered cruel and unusual punishment for the crime of deliberate murder. In reaching this conclusion the Court pointed out the large number of states that employ the death penalty for first-degree murder. *Id.* at 180-81, 96 S. Ct. at 2928, 49 L. Ed. 2d at 878-79. For us to find a less severe penalty for the same offense to be constitutionally infirm would be questionable at best.[4]

For the reasons stated, the defendant's appeal is denied and dismissed and the judgment of conviction is affirmed.

*Dennis J. Roberts II,* Attorney General, *E. Martin Stutchfield, John G. Hellew,* Special Assistant Attorneys General, for plaintiff.

---

[4]Today's holding does not serve to extinguish our previous ruling in *State* v. *Cline,* 397 A.2d 1309, No. 75-322 C.A. (R.I., filed Feb. 19, 1979), that §12-22-10, insofar as it imposed a mandatory death sentence, was unconstitutional. The constitutional infirmity in Cline was not the use of the death penalty per se, but rather the procedural safeguards surrounding its imposition.

*William F. Reilly,* Public Defender, *Barbara Hurst, John A. MacFadyen III, Dale G. Anderson,* Assistant Public Defenders, for defendant.