RHODE ISLAND DAIRY QUEEN, INC. *vs.* PERCY BURKE.

JANUARY 9, 1963.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

Powers, J. This is a bill in equity seeking an accounting, certain injunctive relief and specific performance of a written contract allegedly breached by the respondent. It was heard by a superior court justice on bill, answer and proof and resulted in the entry of a final decree denying the relief prayed for by the complainant, but awarding money damages computed by the court on the basis of his findings and the terms of the contract. The cause is before us on the respondent's claim of appeal from the decree.

It appears from the bill and a voluminous record that on April 27, 1948 Roy D. Piersel, Thomas H. Piersel, Peter Campagna, Mabel B. Piersel and Jean E. Campagna entered into a contract with H. A. McCullough and J. F. McCullough, an Illinois partnership, whereby the latter conveyed to the former the exclusive right in Rhode Island

to the use of the trademark "Dairy Queen" and other valuable property rights. These latter properties included the right to establish subfranchise holders in this state, the right to purchase and use a certain patented freezer which distinctively molded iced milk mixtures, known nationally as "The Cone with the Curl on Top," and the right to use such trade name in the retail sale of ice cream to the public.

In return therefor the Piersel-Campagna association agreed to pay a total of $7,133 as follows: $1,784 simultaneously with the execution of the agreement, ten cents monthly for each gallon of mix used, and an additional four cents per gallon monthly direct to Ar-Tik Systems, Inc., holder of the freezer patent.

The record further discloses that on January 4, 1952 the Piersel-Campagna association, then known as Dairy Queen of Rhode Island, entered into an agreement with respondent whereby the latter acquired a franchise to operate in the county of Washington, Rhode Island, including the right to purchase the patented freezers. In consideration therefor respondent agreed to pay to Dairy Queen of Rhode Island fifteen cents for each gallon of mix used thereafter. These payments were to be made monthly by the fifth day of the succeeding month, and if not so paid the agreement was subject to cancellation at the option of Dairy Queen of Rhode Island. The respondent further agreed that if the franchise were canceled as aforesaid, Dairy Queen of Rhode Island would be entitled to claim from respondent the patented freezers at the fair market value, which however was not to exceed $1,000 for each freezer.

Thereafter, on March 22, 1954, the parties ratified the foregoing agreement as to all the terms thereof pertinent to these proceedings but made certain changes relative to the territorial rights of respondent.

It further appears that sometime late in 1954, Peter and Jean Campagna sold all of their interest in Dairy Queen of Rhode Island and Thomas Piersel sold a part of his

interest to three individuals by the name of Almonte. These latter were represented by Francis Cappalli, Esquire, a Rhode Island attorney. He testified that after the acquisition of such interest by the Almontes, they, together with Roy, Mabel and Thomas Piersel, sold all of the outstanding interests in Dairy Queen of Rhode Island, including the latter company's agreement with respondent, to complainant, a Rhode Island corporation formed by Mr. Cappalli. He testified that complainant was incorporated November 17, 1954.

As observed by the trial justice, the records of complainant corporation, or such of them as Mr. Cappalli was able to produce, were quite meager and included no documentary evidence of the transfer to complainants, nor of the sale of the Campagna-Piersel interest to the Almontes. Neither was any documentary evidence produced of the McCullough partnership consent to such assignment as required by the terms of the April 27, 1948 agreement. Attorney Cappalli testified, however, that it was understood such consent had been given. It would appear that some documents were not available by reason of the death of the original counsel representing the Piersels and the Campagnas.

The evidence discloses that respondent, pursuant to his rights under the agreement, purchased four freezers, erected two buildings, one in the town of South Kingstown and the other in the town of Westerly, conformable to blueprints, designs and specifications furnished by Dairy Queen of Rhode Island, and commenced the retail sale of Dairy Queen products in those communities. The fifteen cents per gallon was paid monthly by respondent in accordance with the agreements until April 1955, at which time he ceased to make payments as required. On June 30, 1955, more than thirty days having elapsed since the last payment, complainant, in writing, notified respondent of the termination of such agreement.

The evidence further discloses that on August 18, 1955, respondent forwarded to complainant a check purporting to be payment for the months of April, May, June and July of 1955. The amount tendered, however, was computed for a part of this period at fifteen cents per gallon as agreed, but at less than the agreed price per gallon for the rest of the period. The complainant refused to accept such payment, and again advised respondent that because his payments were in default the agreement had been terminated.

By letter dated October 8, 1956, respondent was advised that complainant was exercising its option to claim the four freezers as provided by the agreement. A certified check in the amount of $4,000 was tendered by enclosure, such amount being the maximum consideration as by the terms of the agreement provided. It appears that respondent refused to surrender the freezers and had continued so to refuse at the time of the hearing on the bill.

In compliance with the subpoena duces tecum, respondent produced all of his records from 1954 on and was called under the adverse witness statute by complainant. He testified that the payments tendered to complainant for May, June and July of 1955 were for amounts less than those required under the contract, but that the difference was represented in payments of four cents per gallon, which he attempted to make to Ar-Tik directly. The respondent admitted that he was attempting to by-pass complainant and conceded that he had been advised by an officer of the Ar-Tik Systems that he was required to deal directly with complainant.

It is clear from the record that the iced milk or soft ice-cream mix was purchased from several dairies who were not concerned with the fifteen cents per gallon for which respondent was liable to complainant. The amount claimed by complainant was the consideration which respondent was obligated to pay for the privilege of processing the mix and for advertising and selling the resulting product at

retail as "Dairy Queen" or "The Cone with the Curl on Top."

The respondent's records and his testimony disclose that he continued in business after notice that the agreement had been terminated and further that he had incorporated as "Dairyland, Inc." in 1957. He denied, however, that he continued to produce the same product or, in substance, that he was in any manner infringing upon any property right of complainant.

Numerous exhibits and the testimony of Roy and Mabel Piersel, Alfred Almonte, representatives of the several dairies and others were offered in evidence for the purpose of showing that, after complainant had terminated respondent's franchise, respondent continued and was still continuing to conduct his business as theretofore and all to the damage of complainant.

The bill prayed for specific performance of that portion of the agreement which required respondent to convey the four patented freezers as heretofore set forth, for an accounting and for certain injunctive relief.

On January 10, 1962, the trial justice rendered his decision denying the prayer for specific performance on the ground that complainant had failed to exercise its option in the manner required by the terms of the agreement, citing 12 Am. Jur., Contracts, §45, and 1 Restatement, Contracts, §59. He further denied the injunctive relief for which complainant prayed, but gave no reason therefor. Since, however, complainant has not prosecuted a claim of appeal, we need not consider the implications of his decision in this regard.

In his decision the trial justice reviewed the travel of the proceedings and the evidence, oral and documentary, and concluded that respondent "had found himself involved in a contract which he wanted to get out of. He apparently came to the conclusion that other persons were operating stands of a similar type and were not paying the royalties

that he had agreed to pay. He attempted to side-track the complainant corporation and do business directly with the national organization."

Commenting upon respondent's account of the controversy, the trial justice observed, "There were several instances in the respondent's testimony which made it difficult to believe him."

Denying the prayer for an accounting, the trial justice held, however, that complainant was entitled to money damages at the rate of fifteen cents per gallon of mix used by respondent from April 1955 through 1960. The respondent's records for that period disclosed a total of 39,398 gallons to have been purchased during the time in issue and the court awarded complainant damages in the amount of $5,909.70.

The respondent assigns twelve specific reasons in support of his appeal which he compresses into nine contentions. We shall consider such contentions seriatim.

The respondent first contends, in effect, that the court erred in holding that the Campagnas, Thomas Piersel and the McCullough partners were not proper or necessary parties to the proceedings. He argues that since the evidence discloses that the Campagnas and Thomas Piersel were parties to the agreements between the original association and himself, as well as to the agreement between the association and the McCullough partners, they should have been joined as party respondents because of outstanding rights which they might have against him. He based his contention largely on the proposition that there was no documentary evidence of the alleged transfer by the Campagnas and Thomas Piersel to the Almontes, nor of any of them to complainant. This contention is without merit.

It is apparent from this and other contentions that respondent misconceives the nature of complainant's suit. Except for the defaulted payments for the months of April, May and June 1955, during which time the agreement was

still in effect, the complainant does not seek to recover for payments due under the agreement. Rather, it seeks to recover damages for a willful violation of and interference with the exclusive rights of complainant's franchise as "Rhode Island Dairy Queen, Inc."

The complainant was incorporated some five months prior to the defaults which resulted in the termination of respondent's status as a subfranchise holder. If respondent, in such circumstances, believed that former members of the association were necessary parties he should have pleaded such issue before proceeding to hearing on the bill of complaint.

Nor is there any merit in respondent's argument that there was no evidence on which the trial justice could find that all of the outstanding rights of the association had become vested in complainant. Roy Piersel and counsel for the Almontes both testified in this regard to the satisfaction of the trial justice that complainant had acquired all outstanding rights. This finding is entitled to great weight and we cannot say that it is clearly wrong.

Although the documents by which such transfers were made would be the best evidence, the testimony of the attorney who had personal knowledge that a sale of the questioned interest had in fact been negotiated by him was admissible, the documents in question not being available. *M. M. Inman & Co.* v. *Potter,* 18 R. I. 111.

Nor is respondent in any position to question whether the transfer to complainant corporation had the prior approval of the McCullough partners. It was he who testified that an officer of the McCullough interests, which the record discloses included Ar-Tik Systems and National Dairy Queen Association, advised him that he was obligated to deal directly with complainant.

The respondent's second contention is that the trial justice erred in holding that complainant's damages were not restricted to the liquidation damages referred to in the

agreement between complainant's predecessor and himself. By the terms of that agreement respondent was obligated to pay, in addition to the fifteen cents per gallon monthly, the sum of $300 at the time the agreement was executed. Whether this sum was in fact paid does not clearly appear, but that it is the liquidated damages referred to is not open to serious question. The fifteen cents per gallon was to be paid monthly on the number of gallons used the previous month, and during the time that the agreement remained in effect such payment could not be considered as damages in any sense of the word. Again it is to be noted that this argument misconceives the nature of the litigated complaint.

The remaining contentions, save only that numbered eight, relate to the nature of the damages awarded by the trial justice. It is argued, in effect, that no damages whatsoever were due to complainant, but that if there were they should have been computed at the rate of eleven rather than fifteen cents per gallon and that complainant was under an obligation to have mitigated its damages by selling the Washington county franchise to some other party after terminating respondent's franchise in June 1955.

The respondent argues that when the trial justice denied the prayers for an accounting, for injunctive relief, and for specific performance of his promise to sell the patented freezers to complainant if the agreement between the parties were terminated by reason of respondent's default, it was error for the trial justice to award money damages when no equitable relief had been granted. In support of this argument he cites *Barnes* v. *N. Roy & Son*, 27 R. I. 534, and *Cheetham* v. *Ferreira*, 73 R. I. 425.

These cases are readily distinguishable on the posture on which they arose from that in the instant cause. While it is genrally true, as was said in the *Cheetham* case, that equity does not ordinarily decree mere money judgment, this court in that case also observed at page 431, "There

are some exceptions, however, where equity has awarded money damages as incidental to the principal relief."

The respondent's clear implication from his reading of that case is that the award of money damages must be incidental to the principal relief *granted*. Such, however, was not the holding therein. The decree appealed from was modified so as to permit the parties to litigate further the question of money damages, if all matters in that regard had not been fully litigated in the equity suit, such appearing to be the case. Here, however, no unlitigated questions remain. It was in lieu of an accounting that the trial justice made the money award and he did so because all of the material and necessary factors which would have been the subject of an accounting were before him. On his findings, which we cannot say are clearly wrong, the question of an accounting was reduced to a simple matter of arithmetic.

If the relief sought is properly the subject of a suit in equity the trial justice sitting as chancellor has jurisdiction to determine and to resolve the merits of the controversy. See *Troia* v. *Leone*, 74 R. I. 271. The instant bill clearly presented a cause for relief in equity. The trial justice gave his reasons for denying the prayer for specific performance, but gave none for denying injunctive relief. In both instances, however, complainant has not seen fit to complain thereof and it is not open to respondent to complain on its behalf.

Nor is there any merit in the argument that if the principle adopted by the trial justice were correct, it was error for him to apply the factor of fifteen cents per gallon rather than eleven as contended by respondent. His obligation was to pay the fifteen cents to complainant without regard to whether the latter was obligated to pay an identical or some other amount to a third party. Furthermore, the decision of the trial justice that fifteen cents per gallon should be the measure of damages to which complainant

was entitled by way of an accounting was proper, since anything less would have permitted respondent to profit from trading on the strength of complainant's exclusive property right without compensating the latter therefor as agreed.

Be that as it may, respondent contends, the trial justice erred in not holding complainant responsible for failing to mitigate its damages by procuring another purchaser for the franchise in the Washington county area previously enjoyed by respondent. He relies heavily on the testimony of the Piersels to the effect that no new franchise was granted by complainant for the lucrative summer area held by respondent after the latter's franchise had been terminated in June 1955. He argues that the lucrative nature of the area is an assertion made by complainant in its bill and that this, coupled with the probability that complainant could have easily serviced the Washington county area with other franchise holders without any cost to it, meets respondent's obligation to prove that the damages could have in fact been lessened if complainant had been diligent.

This argument again misconceives the nature of complainant's claim to damages by reason of respondent's unjustified interference with complainant's property rights. It is the substance of this argument that if complainant had pre-empted competition, it would not have been possible for respondent to have successfully trespassed on complainant's rights. Thus, respondent urges, his sales would have been so diminished as to reduce the number of gallons of iced milk mix which he would have used in an unlawful application of the Dairy Queen process and reputation.

The respondent's remaining contention that complainant had an adequate remedy at law is likewise without merit. In *Setchell Auto Parts Inc.* v. *Artamian & Sutcliffe Inc.*, 50 R. I. 144, this court held that after a decree has been entered in a bill in equity following hearing on the facts,

it is too late on appeal to raise the issue that the complainant had an adequate remedy at law, as such contention should have been raised by demurrer to the bill and the respondent must be held to have waived his right to question the jurisdiction of the court when he proceeded to trial without objection upon the issue of fact raised by his answer. Here, respondent did not demur but filed an answer to each and every averment in complainant's bill.

If it be argued that from the allegations contained in the bill there could be no prior determination that the complainant's prayers for relief would be reduced by the evidence on the findings of the trial justice to a right to monetary damages, then it follows that the bill set forth a cause properly cognizable in equity.

The respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

### ON MOTION FOR REARGUMENT.

#### JANUARY 28, 1963.

PER CURIAM. After our decision in the above cause was filed, the respondent was granted permission to present a motion for reargument. Pursuant thereto he has filed such a motion setting out therein the particular reasons on which he bases his contention that justice requires a reargument of the cause.

We have carefully considered those reasons and are of the opinion that they suggest nothing which in the circumstances warrants a reargument.

Motion denied.

*Kirshenbaum & Kirshenbaum, Isidore Kirshenbaum, Alfred Factor, William Y. Chaika,* for complainant.

*Hinckley, Allen, Salisbury & Parsons, Guy J. Wells,* for respondent.