**EGIDIO DiPARDO & SONS, INC., et al.**

v.

**Marc C. LAUZON, et al.**

No. 96–588–Appeal.

Supreme Court of Rhode Island.

Feb. 23, 1998.

Melody A. Alger, Providence, Dennis S. Boluch, for Plaintiffs.

Joseph F. Dugan, Joel D. Landry, Providence, for Defendants.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

A macabre mother-son feud over the remains of a family's multi-generational burial business muddied the funeral plot in this

case. The plaintiff, Elaine DiPardo (Elaine), was the widowed matriarch of the plaintiff, Egidio DiPardo & Sons, Inc. (DiPardo & Sons), a venerable Woonsocket mortuary. James P. DiPardo (James), her now-deceased son, was the funeral home's business manager and heir apparent. A vaunted embalmer and much-heralded funeral-home director, James decided in 1993 to join forces with another Woonsocket funeral merchant. His co-venturer, the defendant, Marc C. Lauzon (Lauzon), owned the defendant, Joseph Lauzon & Sons Funeral Home, Inc. After associating with Lauzon, James unceremoniously left the family's parlor in the lurch and all parties began to engage in stiff internecine competition with one another, replete with burial-bashing recriminations and other unpleasantries, including allegations of commercial "grave robbing."

On appeal the controversy is not nearly so ghoulish. It centers on whether claims alleging tortious interference with contractual relations warrant a jury trial when the claimants have requested both injunctive relief and money damages. We hold that they do. We also reject several related challenges to the sufficiency of the evidence underpinning the Superior Court judgment that was entered after a nonjury trial adjudicating the parties' respective claims.

### Facts and Travel

James' grandfather, Egidio DiPardo (Egidio), established DiPardo & Sons in 1928. For many years the company was one of the most successful funeral homes in Woonsocket. James' father, Angelo, took over when Egidio passed away, and upon Angelo's death in 1977, James' mother, Elaine, succeeded to sole ownership of all the company's stock. James, who apprenticed under his father, became a licensed embalmer and funeral director in his own right. But after a bitter row with his father, James left to pursue other interests and did not return to the family fold until after his father died. In 1980 Elaine transferred 49 percent of the corporate stock in DiPardo & Sons to James. James claimed that his mother did so as a gift to him in grateful appreciation of his years of service as an underpaid apprentice and to induce him to stay on as the business manager. Elaine, on the other hand, contended that James had agreed to purchase her shares and that he executed a $58,000 promissory note in her favor in exchange for her stock. In any event James never made any payments on the note.

Although DiPardo & Sons continued to prosper under James' stewardship, relations between James and Elaine deteriorated over the ensuing years. Long-simmering tensions finally boiled over in early 1993 when the two of them could not agree on whether James should buy out all his mother's ownership in the corporation. After uttering execrable death threats against his mother and the family business,[1] James apparently resolved not only to quit the company for good but also to bury it alive after administering some baneful last rites. Thus, during the week of February 6, 1993, James paid all the business's outstanding debts (including its mortgage), announced to the employees that their services were no longer needed, and filched client lists and other business documents for his own use. And notwithstanding that DiPardo & Sons still had some 300 pre-arranged-funeral contracts in its inventory, he posted a "Closed" sign in the window of the funeral home—presumably to ward off any off-the-street impulse buying from potential walk-in clientele.

While delivering these last and unkindest cuts of all to the mother and the business that weaned him, James associated himself with Lauzon, a principal of another Woonsocket funeral home. James and Lauzon decided to form a competing funeral-services venture (defendant Lauzon & DiPardo Funeral Home, L.L.C. (Lauzon & DiPardo))[2]

1. Elaine testified that James threatened to kill her, to incinerate the funeral home and to blacken her name and that of the business itself. According to Elaine, James vowed that, "He would make my name black and he would destroy the name of DiPardo Funeral Home, and it would take him two weeks."

2. Hereinafter we refer to Lauzon, Joseph Lauzon & Sons Funeral Home, Inc., and the Lauzon & DiPardo Funeral Home, L.L.C., collectively as the Lauzon defendants.

and to open its doors just down the street from the existing DiPardo & Sons parlor. Over the next several weeks James and Lauzon embarked upon a course of conduct that plaintiffs characterized as a concerted effort to inter DiPardo & Sons while "grave robbing" from their roster of pre-arranged-funeral clients. Besides deliberately locating their new venture on the same street in Woonsocket as the DiPardo & Sons funeral home, James and Lauzon ran advertisements four times daily on local radio stations announcing their formation of a new burial business. These advertisements confusingly referred to the address of Lauzon & DiPardo as the firm's "new location," thereby intimating that DiPardo & Sons had simply changed its name and moved a few doors down the block. James and Lauzon also communicated with a large number of DiPardo & Sons' pre-arranged-funeral customers with an eye to inducing them to transfer their patronage to the new funeral home. Either separately or together, James and Lauzon prepared form letters. They then sent these letters to customers of DiPardo & Sons who appeared on the lists that James had spirited away from his family's business. These letters, the trial justice found, were designed to encourage DiPardo & Sons' pre-arranged-funeral clients to transfer their contracts to the newly formed Lauzon & DiPardo. Indeed, to facilitate these transfers, Lauzon, Charon-like, personally ferried some of the prospective transferors to the DiPardo & Sons premises. The plaintiffs claimed that to woo their pre-arranged-funeral customers, James employed just the right mix of unctuous charm and avuncular solicitude to sway even the most discerning of their parlor patrons to transfer their burial business to his new operation. In addition Lauzon and James filed specious complaints against the DiPardo & Sons funeral home with various state regulatory agencies. As a result, plaintiffs con-tended, DiPardo & Sons suffered severe financial losses.

Even as they began to sag under the brunt of this cutthroat onslaught, plaintiffs filed suit in the Superior Court on April 1, 1993. On April 6, 1993, they obtained a temporary restraining order against James and the Lauzon defendants, enjoining them from using the name DiPardo and from having any contact with individuals who had entered into pre-arranged-funeral agreements with DiPardo & Sons. And after a hearing on April 16, 1993, the court issued a preliminary injunction restraining all defendants from affirmatively soliciting DiPardo & Sons' customers and from using the DiPardo name in conjunction with their new enterprise. (However, the order expressly allowed defendants to conduct business with customers who first initiated contact with James or Lauzon). Over one year later, on June 3, 1994, the Superior Court found James in contempt of the preliminary injunction but reserved ruling on possible sanctions until the trial.

Count 1 of plaintiffs' Superior Court complaint served as a catchall for various causes of action leveled against defendants based upon the above-described allegations for which plaintiffs sought both injunctive relief and damages.[3] Count 2 sought damages based upon allegations that James had defaulted on the $58,000 promissory note. Count 3 sought damages based upon allegations that James had wrongfully converted corporate assets by unilaterally raising his salary. James counterclaimed, alleging inter alia that Elaine's stock transfer to him was a gift conditioned upon his maintenance of certain life-insurance coverage.

At first all defendants filed timely demands for a jury trial. Before trial, however, plaintiffs dismissed count 2 in its entirety without prejudice. James' estate[4] then re-

3. Count 1 of the complaint purported to contain the following causes of action: (1) tortious interference with present and prospective contractual relations, (2) improper solicitation of plaintiffs' customers, constituting breach of confidences and theft of trade secrets, (3) violation of plaintiffs' trade name and trademarks, (4) unfair competition, (5) waste of corporate assets, (6) conspiracy to wrongfully convert business assets, (7) oppressive and fraudulent acts, (8) breach of fiduciary duty (alleged against James only), and (9) waste of corporate assets (also alleged against James only).

4. James died before this case was reached for trial and the Estate of James P. DiPardo (the estate) was thereafter substituted as a party defendant.

tracted his earlier jury-trial demand and waived its jury-trial right with respect to count 3—the only count remaining against James' estate. In the wake of these developments the trial justice ruled that, because of its predominately equitable nature, count 1 did not require a jury trial. Thus, notwithstanding the Lauzon defendants' timely jury-trial demand and their protestations about its denial, the trial justice proceeded to try the entire case without a jury.

After hearing extensive testimony and receiving evidence from all parties, the trial justice found in plaintiffs' favor on each of the remaining counts. With respect to count 1, the trial justice stated, "I believe the activities of both Mr. Lauzon and James DiPardo to have been intentional; that James DiPardo intended to hurt his mother and his mother's business. I believe Mr. Lauzon intended to assist that in any way he could * * *." As a result the court entered judgment for plaintiffs in the amount of $285,000 compensatory damages plus interest and costs and assessed an additional $50,000 in punitive damages against each defendant. With respect to count 3, the court found that "the corporation was unaware of this unilateral and unauthorized increase in pay" and entered judgment in favor of plaintiff corporation for approximately $32,000 plus interest and costs. The court also entered a permanent injunction barring the same activities restrained by the preliminary injunction.

### Analysis

### I

### The Right to a Jury Trial for Interference with Contract Claims

We first take up the question of whether the Lauzon defendants should have been afforded a jury trial with respect to the claims lodged against them in count 1 of the complaint. Because count 2 had been dismissed and the jury demand waived for count 3 (a count that was not directed against the Lauzon defendants), count 1 was the only count remaining against the Lauzon defendants

that could arguably involve the right to a trial by jury. As noted, count 1 alleged a panoply of claims. However, the Lauzon defendants argue that count 1's overarching claim—the one that embraced all the others—was a claim for tortious interference with contractual relationships. Because Rule 38 of the Superior Court Rules of Civil Procedure allows a litigant to specify which of several trial issues that party wishes to submit to a jury and because count 1 does include a claim for intentional interference with contract, we accept the Lauzon defendants' characterization of count 1 for the purpose of determining whether they are entitled to a jury trial of this claim.[5]

The trial justice was of the opinion that

"[t]he primary thrust and primary complaint seeks equitable relief * * * primarily, injunction against the defendants from engaging in any further acts of oppression or misconduct against the plaintiffs' corporation including but not limited to the use of the plaintiffs' corporate name, trade name, and trade mark and from attacking and improperly soliciting plaintiffs' customers and customer list and enjoining the defendants from engaging in unfair competition against the plaintiffs for the purpose of misleading and confusing the public and for purposes of damaging or destroying the plaintiffs' business."

The trial justice also determined that "a fair reading of the complaint as filed in this case is a prayer for equitable relief and that the mere inclusion of a prayer for damages does not convert it to an action in law." Accordingly the trial justice refused to grant a jury trial on count 1. Because a fundamental doctrine of Rhode Island civil practice requires that claims historically cognizable at law should be tried by a jury, we hold that the trial justice erred in making this ruling and that he should have submitted count 1 to a jury.

### A. The Modern Status of the Rule of Maryland Casualty Co. v. Sasso

In *Maryland Casualty Co. v. Sasso*, 98 R.I. 483, 492, 204 A.2d 821, 826 (1964), this

---

**5.** We also note that the torts of unfair competition and misuse of trade secrets are often the means used to accomplish an unjustified interference with contracts. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 129, at 992 (5th ed. 1984).

court overturned an equity court's refusal to frame suitable legal issues for submission to a jury. At the time of the *Sasso* decision, which was prior to the merger of law and equity, the General Assembly had endowed equity courts with the power to employ juries to resolve legal issues in equitable suits. General Laws 1956 § 9–14–21, as it then existed, provided, "In equity causes the superior court may frame issues of fact to be tried by a jury, as the court in its discretion may deem advisable * * *." *See Sasso*, 98 R.I. at 487, 204 A.2d at 823. Similar language is retained in our modern Rules of Civil Procedure, which provide: "In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter or [*sic*] right." Super.R.Civ.P. 39(c). *Sasso* noted that former § 9–14–21 codified an ancient equity practice under which the chancery court might, in its discretion, direct issues of disputed fact to be tried by a jury on the law side and the verdict reported back "for the better information of [the equity court's] conscience." *Id.* at 488, 204 A.2d at 824 (quoting 1 Whitehead, Equity Practice § 373, p. 611). *Sasso* held that, in light of this statutory imprimatur and given the importance of the constitutional right to jury trial, it was a clear abuse of discretion for a trial court sitting in equity on a complaint seeking specific performance of an indemnity agreement to decline to utilize the jury-trial option to determine the disputed factual issues underlying the parties' legal rights vis-à-vis the agreement.

Thus, *Sasso* declared that as a matter of sound equity practice any disputed factual issues fundamental to a determination of the parties' "property rights" in the indemnity and surety agreements in that case must be decided initially by a jury because such rights were traditionally "triable by a jury at common law"—despite the fact that chancery courts historically decided legal rights in actions cognizable in equity without necessarily employing a jury. *Id.* at 492, 204 A.2d at 825–26; *see also* 1 Kent, Rhode Island Civil Practice § 38.3 (1969); C.C. Langdell, *A Brief Survey of Equity Jurisdiction*, 1 Harv. L.Rev. 55 (1887). Although the *Sasso* court explicitly declined to say whether article I, section 15, of our State Constitution preserved the right to a jury trial in such situations, and therefore avoided laying down a constitutional rule, the court stated that the rule of equity practice it was announcing and the statute that the rule was intended to serve were both informed by our state "constitutional provisions which preserve inviolate the right of jury trial as it stood at the time of the adoption of the [state] constitution * * *." *Id.* at 490, 204 A.2d at 825.

■ In 1965 the General Assembly repealed § 9–14–21 when this court adopted new rules of civil procedure and the Legislature merged the previously separate law and equity courts. *See* P.L.1965, ch. 55, § 28. This case requires us to decide whether the legislative policies, constitutional considerations, and traditional practices underlying the *Sasso* rule counsel its continued vitality in the context of our modern rules of civil procedure. We believe that they do and that sound practice continues to require the Superior Court to conduct a jury trial upon a timely request with respect to any underlying legal issues in a civil action which were traditionally cognizable at common law when money damages were sought even when, as here, a complaint requests substantial equitable relief. By confirming the continuing viability of the *Sasso* rule after the merger of law and equity, we pay homage to a constitutionally influenced "policy that favors the jury trial and requires the determination of legal issues by a jury, even though certain issues in the case may be equitable," *Bendick v. Cambio*, 558 A.2d 941, 944 (R.I.1989), while also fostering "that complete union [of law and equity] which the new rules not only permit, but encourage." *Rowell v. Kaplan*, 103 R.I. 60, 68, 235 A.2d 91, 96 (1967) (quoting *Ring v. Spina*, 166 F.2d 546, 550 (2d Cir.1948)); *see also* 1 Kent § 38.3, at 318 (opining that *Sasso* is "surely applicable under the new rules").

B. *Constitutional Considerations Touching upon the Right to a Jury Trial*

Our present rules of civil procedure, like the statutory provisions that preceded them,

should be construed so as to preserve inviolate the right to a jury trial as it existed at common law, though the rules should neither extend nor diminish that right. *See Bendick,* 558 A.2d at 944; *In re Advisory Opinion to the Senate,* 108 R.I. 628, 634, 278 A.2d 852, 855 (1971); *Dyer v. Keefe,* 97 R.I. 418, 420, 198 A.2d 159, 160 (1964). To this end, it is useful to review the underlying constitutional tenets that spawned the *Sasso* rule of practice to more clearly appreciate the interplay between the constitutional guarantee to trial by jury and the *Sasso* rule of practice.

"Although Rhode Island is not constrained by the mandate of the Seventh Amendment to the United States Constitution, article I, section 15, of the constitution of this state guarantees that '[t]he right of trial by jury shall remain inviolate.'" *Bendick,* 558 A.2d at 943 (quoting *Briggs Drive, Inc. v. Moorehead,* 103 R.I. 555, 557, 239 A.2d 186, 187 (1968)); *In re Advisory Opinion to the Senate,* 108 R.I. at 632, 278 A.2d at 854 (Seventh Amendment to the United States Constitution not applicable to trials in state courts). Rule 38(a) of the Superior Court Rules of Civil Procedure echoes this constitutional guarantee, declaring: "The right of trial by jury as declared in Article I, Section 15 of the constitution of this state or as given by a statute shall be preserved to the parties inviolate." Rule 38 implements this constitutional guarantee by allowing a party in a civil action to demand a jury trial on all issues so triable or to specify certain issues "which the party wishes so tried." Super.R.Civ.P. 38(c); *Rowell,* 103 R.I. at 67–68, 235 A.2d at 95–96 (discussing parameters of rule).

▮ The constitutional right to have issues of fact determined by a jury is preserved as it existed at common law at the time of the adoption of our original constitution in 1842, which became operative on May 2, 1843. *See In re McCloud,* 110 R.I. 431, 435, 293 A.2d 512, 515 (1972); *Mathewson v. Ham,* 21 R.I. 311, 314, 43 A. 848, 849 (1899), *overruled in part with respect to criminal trials, State v. Holliday,* 109 R.I. 93, 104 n. 2, 280 A.2d 333, 339 n. 2 (1971). *Bendick,* decided three

years after the 1986 adoption of our revised Constitution, teaches that this court, when analyzing the right to jury trial under our modern constitution, will continue to look to common-law forms of action as they existed when Rhode Island's original Constitution was promulgated in the early 1840s.[6] *See Bendick,* 558 A.2d at 944.

▮ Although our modern rules of civil procedure merged law and equity and abolished their separate forms of action, historical distinctions between actions at law and suits in equity remain relevant "for the purpose of determining the right to a jury trial." *Rowell,* 103 R.I. at 67, 235 A.2d at 96. Thus, in assessing whether a particular cause of action merits a jury trial, we look to the historical nature of the claim, tracing its origins and striving to discern analogies to forms of action known to the common law before the merger of law and equity. *Bendick,* 558 A.2d at 944. In so doing, this court has "followed a course substantially parallel" to that of the United States Supreme Court in *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), and *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), although we take a more distinctly historical approach to such questions. *Bendick,* 558 A.2d at 944.

▮ In *Rowell* the court addressed a bill in equity brought before the new rules of civil procedure had been adopted but tried after the effective date of the new rules. The complaint had been amended to conform to the new rules and alleged that certain mortgage agreements were unconscionable and usurious. The complaint sought cancellation and recision of the notes and an injunction restraining foreclosure but it also sought monetary damages on an action at law for usury. *Rowell,* 103 R.I. 60, 235 A.2d 91. Considering whether the plaintiff was entitled to a jury trial, the *Rowell* court stated that when a complaint presents claims sounding both in equity and law, the fact that the claims must now be brought in a single action in a single court rather than separately in a court of law and a court of equity "in no

---

**6.** When our present constitution was adopted in 1986, it reincorporated the preservation clause of article I, section 15, of the 1843 constitution without change. *See* Constitution of the State of Rhode Island and Providence Plantations, annotated ed. (1988).

way affects [the litigant's] right to a jury trial." *Id.* at 68, 235 A.2d at 96. In reaching this conclusion the court expressly followed the Supreme Court's reasoning in the *Dairy Queen* case. There the Supreme Court indicated that in light of the single form of action created by the federal rules and the strong preference for protecting the right to jury trial, a federal court faced with both equitable and legal claims and with factual issues common to both must determine any legal claims "prior to any final court determination of * * * equitable claims." *Dairy Queen,* 369 U.S. at 479, 82 S.Ct. at 901, 8 L.Ed.2d at 52 (discussing *Beacon Theatres* ). Thus we construe the court's decision in *Rowell* as affording a similar prioritization to legal claims in our own state constitutional jurisprudence.[7] And although the *Rowell* court ultimately refused a jury trial in that case because the complaint failed to allege all the requisite elements of the legal claim, *Rowell* clearly established the general rule that when a civil action comprises both legal and equitable claims, the legal claims, if adequately presented, must first be presented to a jury.

Although this is not a case in which plaintiffs were forced to bring separate legal and equitable claims together in one post-merger proceeding, the constitutional right to jury trial is likewise implicated in this case. The *Sasso* rule of practice, in seeking to promote the use of a jury to resolve disputed factual issues when "[t]he rights sought to be determined and enforced are essentially legal, as distinguished from equitable rights," *Sasso,* 98 R.I. at 490, 204 A.2d at 825, requires the Superior Court to submit to a jury any claims that could have been litigated in an action at law in 1843, even if the court is also asked to provide equitable relief in the first instance and then permanently after a trial. And this is so even if the entire action could have been brought before the pre-merger equity court.[8] Therefore, if it can be demonstrated that a claim for contract interference requesting money damages was cognizable at law in 1843, the *Sasso* rule would require the trial court to submit the disputed factual underpinnings of such a claim to a jury—regardless of the fact that the plaintiffs here sought substantial equitable relief which would have allowed them access to the pre-merger equity court as well as the law court.[9]

### C. The Historical Nature of the Interference With Contract Claim

This court first recognized a common-law claim for intentional interference with contract in 1934. In *Local Dairymen's Cooperative Association, Inc. v. Potvin,* 54 R.I. 430, 433, 173 A. 535, 536 (1934), the court acknowledged the propriety of bringing such a claim in a bill of equity because "[t]he most effective way of preventing a breach of the agreements is to enjoin a third party." However, the *Potvin* decision also impliedly recognized that if damages were requested, the same claim could be brought at law. Electing to follow the reasoning of the Supreme Judicial Court of Massachusetts in *Beekman v. Marsters,* 195 Mass. 205, 80 N.E. 817 (1907), the *Potvin* court stated that " '[w]here the plaintiff proves that the defendant unlawfully interferes or threatens to interfere with his business or his rights under a contract, and further makes out in proof that damages will not afford an adequate remedy, equity

---

7. This is not to say that we adopt wholesale the entirety of federal Seventh Amendment jurisprudence. For example, our decision in *Tilcon Gammino, Inc. v. Commercial Associates,* 570 A.2d 1102, 1107–08 (R.I.1990), declined to follow *Beacon Theatres* with respect to compulsory counterclaims.

8. The *Sasso* rule, of course, is not applicable to a claim cognizable only in equity and not at law. For example, *Berberian v. Martin,* 100 R.I. 227, 214 A.2d 189 (1965), held that *Sasso* did not require a jury trial where the plaintiff sought equitable cancellation of a contract on the theory of fraud in the inducement even where the plaintiff might have also pursued a cause of action at

law to recover money damages for deceit. As noted, we decline to address whether constitutional provisions would necessitate a jury trial in a similar case brought as a civil action under the new rules. Nor do we pass upon the post-merger vitality of the historic power of equity courts to award money damages incidental to an equitable claim without the assistance of a jury. *See, e.g., Rhode Island Dairy Queen, Inc. v. Burke,* 95 R.I. 339, 347–48, 187 A.2d 521, 526 (1963).

9. Like the court in *Sasso,* we need not reach the question of whether the preservation clause of the Rhode Island Constitution would command a similar result.

will issue an injunction.'" 54 R.I. at 433–34, 173 A. at 536.

In *Beekman*, the Massachusetts Supreme Judicial Court had traced the root of contract-interference claims to the "settled" rule in Massachusetts declared in *Walker v. Cronin*, 107 Mass. 555 (1871), that an action at law would lie for intentional interference with any contract. *Beekman*, 80 N.E. at 818. *Walker* itself attributed the origin of this form of action to a long line of English precedent establishing that " '[i]n all cases where a man has a temporal loss or damage by the wrong of another, he may have an action upon the case to be repaired in damages.' The intentional causing of such loss to another, without justifiable cause, and with the malicious purpose to inflict it, is of itself a wrong." *Walker*, 107 Mass. at 562 (quoting Lord Chief Baron Comyns' Digest, *Action on the Case*, (A)).

In one of these hoary English precedents cited by the Supreme Judicial Court, *Garret v. Taylor*, [1621] Cro.Jac. 567, 79 E.R. 485 (K.B.), the King's Bench entertained an action for misfeasance when the defendant, threatening mayhem and vexatious suits, deterred customers of the plaintiff, a freemason, from coming to his quarry to purchase stones. And in another, a jury verdict for damages against the master of the trading ship *Othello* was upheld in a special action on the case after the *Othello* had fired upon African natives while *"contriving and maliciously intending to hinder and deter the natives from trading* with" another ship, the *Tarleton*. *Tarleton v. M'Gawley*, [1793] Peake N.P.C. 270, 271, 170 E.R. 153 (emphasis in original). In *Keble v. Hickringill*, [1707] 11 East 571, 574 n. (a); 11 Mod. 74; 3 Salk. 9; Holt 14; 88 E.R. 898 (Q.B.), and again in *Carrington v. Taylor*, [1809] 11 East 571, 103 E.R. 1126 (K.B.), actions on the case were allowed, as for example when the *Carrington* defendant "well knowing the premises, but contriving and wrongfully and unjustly intending to injure and aggrieve the plaintiff, and to deprive him of a great part of the profits and advantages," interfered with the plaintiff's business of "seducing" and then shooting wild fowl on tidal marshes. In allowing the cause to proceed even

where the defendant's acts were ostensibly lawful but performed in a malicious manner, Lord Chief Justice Holt commented: "I am of the opinion that this action doth lie. It seems to be new in its instance, but is not new in the reason or principle of it." *Carrington*, 11 East at 575 (quoting *Keble*).

Later cases cited these same precedents as establishing the broad and flexible precept that "intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse." *Mogul Steamship Co. v. M'Gregor, Gow. & Co.*, [1889] 23 Q.B.D. 598, 613, A.C. 25 (Eng.C.A.). Thus common-law courts conceived of cases alleging malicious interference with business interests as variations upon one of the great themes of the common law—that intentional wrongdoing causing damage to another is actionable at law—and not as the development of a new principle or new cause of action each time it was invoked and applied to new facts.

Whether the modern tort of interference with contract (which is now universally recognized in England and the United States) can be said to have existed at common law in 1843, however, requires a somewhat more extended analysis. Legal commentators typically identify the English case of *Lumley v. Gye*, [1853] 2 El. & Bl. 216, 118 E.R. 749 (K.B.), decided a decade after the adoption of our State Constitution, as the first appearance of the tort in its contemporary visage. *See, e.g.*, W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 129, at 980 (5th ed. 1984); Restatement (Second) of Torts § 766, at 8 (1979). In *Lumley* the Queen's Bench struggled to determine whether the seamless webs of the common law could enfold a cause of action based upon interference with a personal service contract. The plaintiff, a proprietor of the Queen's Theatre, accused the defendant of having willfully and maliciously enticed his star "dramatic artiste," Johanna Wagner, to abandon her contract of performance with the theater. Ultimately a majority of the court, guided by what it viewed as fundamental principles of the common law, decided to

recognize the action as one on the case. *Lumley*, 2 El. & Bl. at 224–25, 118 E.R. at 752–53.

The decision in *Lumley* was heavily criticized in its day. Some commentators viewed the case as a untoward extension of existing case law and even doubted that its imposition of tort liability on a stranger to the contract was defensible intellectually. *See, e.g.,* William Schofield, *The Principle of Lumley v. Gye, and its Application*, 2 Harv.L.Rev. 19, 21–22 (1889); C.C. Langdell, *A Brief Survey of Equity Jurisdiction*, 1 Harv.L.Rev. 55, 57 (1887).[10] Some commentators also contend that American jurisdictions were hesitant at first to adopt this "new principle" of the common law, although it is undisputed that by the early 1900s the tort was widely recognized. *See* Prosser and Keeton § 129, at 980; Restatement (Second) of Torts § 766(d), at 10. But a close scrutiny of *Lumley* reveals that the decision of the Queen's Bench to recognize this common-law action was neither new nor innovative. As the courts in both *Lumley* and *Walker v. Cronin* made clear, the principles that countenanced such an action were already firmly entrenched in the earlier established common law.

The *Lumley* majority identified obvious antecedents to this type of action dating to well before the time that Rhode Island preserved the right to jury trial. Indeed, incipient forms of this action can be discerned even as far back as Roman law, which provided a remedy for violence against the relatives or servants of the *paterfamilias*. In addition, the fourteenth-century English Ordinance of Labourers was designed to protect manorial lord and servant relationships in the aftermath of the Black Death. *See*

Prosser and Keeton § 129, at 980; *Lumley*, 2 El. & Bl. at 224, 241, 119 E.R. at 752, 758. The *Lumley* majority specifically noted its reliance upon each of these ancient precedents, which were also cited by the Massachusetts high court in *Walker*. But *Lumley* did not, however, limit its rationale to the citation of these precedents. Rather, it drew down even more deeply into the well of common-law principles. "Whatever may have been the origin or foundation of the law," explained Lord Crompton "it must now be considered clear law * * *." *Lumley*, 2 El. & Bl. at 224, 118 E.R. at 752. Moreover, the court described its holding as "apply[ing] such a remedy to a case 'new in its instance, but not new in the reason and principle of it,' that is, to a case where the wrong and damage are strictly analogous to the wrong and damage in a well recognized class of cases." *Id.* at 229, 118 E.R. at 754 (Crompton, J.) (citing *Keble v. Hickeringill* and *Carrington v. Taylor*). Indeed, Lord Coleridge, although of the opinion that the cause was bad, nonetheless recognized that novel factual circumstances would not foreclose the possibility that a case could still be recognized at law.[11] *Lumley*, 2 El. & Bl. at 250–51, 118 E.R. at 762 (Coleridge, J., dissenting) ("I am aware that with respect to an action on the case the argument primae impressionis is sometimes of no weight.").

This canvas of ancient authorities persuades us that Rhode Island's courts, if presented with a similar case in 1843, would have recognized, as did *Lumley v. Gye*, that the allegations of tortious and malicious interference with contract as pled in this complaint stated an action on the case cognizable

---

**10.** *Walker v. Cronin*, 107 Mass. 555 (1871), offers an anticipatory retort to Dean Langdell's later criticisms: "There are indeed many authorities which appear to hold that to constitute an actionable wrong there must be a violation of some definite legal right of the plaintiff. But those are cases, for the most part at least, where the defendants were themselves acting in the lawful exercise of some distinct right, which furnished the defence of a justifiable cause for their acts, except so far as they were in violation of a superior right in another." *Id.* at 563 (admitting that normal commercial competition resulting in disadvantage is damnum absque injuria, but that where similar competitive devices are employed with malicious or unjustified purposes, an action

on the case will lie); *see also Mogul Steamship Co. v. M'Gregor, Gow & Co.*, [1889] 23 Q.B.D. 598, 614, A.C. 25 (Eng.C.A.).

**11.** Lord Coleridge chastized the majority not for their adherence to the principle that malicious actions were remediable at law, but for allowing "themselves, in the pursuit of perfectly complete remedies for all wrongful acts, to transgress the bounds which our law * * * has imposed on itself, of redressing only the proximate and direct consequences of wrongful acts." *Lumley v. Gye*, [1853] 2 El. & Bl. 216, 252, 118 E.R. 749, 762 (K.B.).

at law. *Cf. Bendick*, 558 A.2d at 944 (holding that Rhode Island courts in 1843 would have allowed an action to establish and collect an administrative penalty as an action for debt triable to a jury at common law). Thus, because the parties' rights and liabilities with respect to contract interference to this claim could have been decided in an action at law (and would have been so decided had the plaintiffs not also requested injunctive relief), the *Sasso* rule mandates that the trial court should afford a jury trial on any disputed factual issues pertinent to this claim as if it had been brought in a pre-merger court of law seeking money damages. That plaintiffs may also have been able to file a petition in equity seeking injunctive relief based on these same allegations does not alter the basic legal nature of the damages claim— even though in times of old the Chancery Court may well have proceeded to decide plaintiffs' damages claims as incidental to its exercise of the court's equity powers. *See generally* Langdell, 1 Harv.L.Rev. 55 (expounding upon the interplay of equity and law). Thus, we hold that the *Sasso* rule of equity practice requires that any disputed factual issues underlying the plaintiffs' claims relating to contract interference should be decided by a jury, rather than by the court alone, and that it was an abuse of discretion in this case to refuse to so employ a jury upon the Lauzon defendants' timely request for a jury trial.

Therefore, the Lauzon defendants should have been granted a jury trial, as requested, on the contract-interference claims alleged in court 1 of the complaint. Because this disposition requires a remand to the Superior Court for a jury trial on the claims against the Lauzon defendants, we need not reach their remaining claims of error relating to the sufficiency of the evidence underlying the trial court's computation of compensatory damages or its award of punitive damages.

## II

### The Estate's Claims of Error

◼ We now turn to the estate's allegations of error. The estate, it may be remembered, waived any right to a jury trial on all counts, so this issue cannot form one of the grounds for the estate's appeal. Rather the estate argues that the trial justice erred in computing plaintiffs' damages as a result of defendants' actions. Damage issues, however, are usually fact specific. Thus we shall not overturn a factually responsive damages finding after a bench trial unless it is apparent from the record that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. *See Warwick Musical Theatre, Inc. v. State*, 525 A.2d 905, 912 (R.I.1987).

◼ In this case the damages evidence was complicated and voluminous. The court heard from an expert financial witness called by plaintiffs. James admitted at his deposition that he had solicited up to twenty-five clients of DiPardo & Sons. Moreover, a Superior Court justice had earlier found him to be in contempt of the temporary injunction it had entered to prevent such activity. The evidence also established that DiPardo & Sons suffered a grave loss of business following James' departure. Although the trial justice recognized that the "prearrangement" contracts were not funeral-home assets in a strict accounting sense, he nonetheless found that the advantageous business relationships embodied in such contracts presented "a tremendous potential for future business." To calculate plaintiffs' damages, the court was invited to compare the losses that DiPardo & Sons actually incurred in the aftermath of James' tortious efforts to ruin his mother's business with the losses that a funeral home would typically incur upon the innocent departure of a valuable employee. Because the record clearly shows that the trial justice thoroughly comprehended the damages evidence presented during the trial and applied it in a rational fashion to the financial evidence before him, we cannot say that he was clearly wrong in calculating the damages as he did.

◼ The estate next claims that the trial justice erred in finding that Elaine's stock transfer to her son James was not a gift. As the estate concedes, it bore the burden of proving donative intent. *See Walther v. McOsker*, 87 R.I. 386, 392, 142 A.2d 128, 131 (1958). Given the promissory note, the trial

justice found "overwhelming evidence * * * that it was not a gift of stock for past or future services * * *." The trial court also found that James' continued nonpayment of the note was a "constant thorn" in their relationship and did not in any way evince Elaine's forgiveness of the debt. On the basis of this record we are unable to conclude that the court's findings were clearly wrong.

■ The estate also contends that the trial justice erred in allowing Elaine to testify that she was unaware that James had unilaterally increased his own pay in light of the fact that she had approved an annual financial report that, the estate argues, legally ratified his actions. However, the trial justice expressly considered the estate's theory in his bench decision and concluded that "nothing in the evidence" supported the notion that Elaine had become aware of the pay raises through her mere approval of the company's yearly financial documents or her endorsement of a corporate resolution generally ratifying the actions of corporate representatives during the past year. Absent a more specific indication that Elaine knew about and did not object to James' unilateral pay increase, he found that she had not thereby tacitly ratified James' wrongful diversion. Our review of the testimony and other documentary evidence in the record confirms that the trial justice's conclusions are not subject to reversal.

■ With respect to the estate's contention that Elaine's testimony should have been excluded under the parol-evidence rule, we hold that the rule simply has no application in this situation. The annual financial reports and corporate resolutions were proffered to support a claim that Elaine had thereby ratified all aspects of James' conduct in running the family business. However, the parol-evidence rule only bars evidence of a previous or contemporaneous oral promise extrinsic to an integrated contract that would purport to contradict or modify the express terms of the written contract. *See Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1192 (R.I.1994). The estate proffered the annual report as an admission, statement, or verbal act—but not as an integrated contract whose terms were now being challenged.

Thus, the parol-evidence cases cited by the estate are entirely inapposite to the issue before us. *Compare Supreme Woodworking Co. v. Zuckerberg*, 82 R.I. 247, 107 A.2d 287 (1954) (applying rule to written purchase-order agreement); *D.W. Flint Motor Sales, Inc. v. Crofton*, 54 R.I. 160, 171 A. 236 (1934) (applying rule to a bilateral written contract); *Dennis v. Joslin Manufacturing Co.*, 19 R.I. 666, 36 A. 129 (1896) (holding on the particular facts before the court that parol evidence of a dividend declaration was inadmissible because of its potential to result in disparate rights between similarly situated stockholders). In any event the estate made no objection on this ground during Elaine's direct examination when this subject matter was raised, and thus it cannot now be heard to invoke this theory for the first time on appeal. *See Montecalvo v. Mandarelli*, 682 A.2d 918, 926 (R.I.1996) (raise-or-waive rule requires litigant to bring evidentiary objection and grounds to attention of trial justice).

Finally, during a prebriefing conference before a justice of this court, the parties agreed that the trial justice should not have awarded punitive damages against the estate because James had died before the trial. Given this agreement and without independently passing on this aspect of the appeal, we vacate that portion of the judgment below against James' estate that awards punitive damages but affirm the judgment as it relates to the estate in all other respects.

### Conclusion

The appeal of the defendants, Marc C. Lauzon, Lauzon & DiPardo Funeral Home, Inc., and Joseph Lauzon & Sons Funeral Home, Inc., is sustained; the appeal of the defendant, Estate of James P. DiPardo is dismissed; and the papers in this case shall be remanded to the Superior Court for a new jury trial of the plaintiffs' claims against the Lauzon defendants and for the entry of an amended final judgment against the Estate of James P. DiPardo consistent with this opinion.